**(1) Brief Joint Statement Describing the Action, [e.g., "Putative securities class action pertaining to the restatement of earnings for the period May 1, 2009 to May 30, 2009"]:**

Centralized multidistrict litigation involving personal injury claims relating to the alleged migration and/or perforation of implanted intrauterine device manufactured and sold by Bayer Healthcare Pharmaceuticals Inc. ("Defendant") under the brand-name Mirena®.

**(a) Estimated amount of Plaintiff(s)' Claims:**
Less than $100,000
Between $100,000 and $999,999
Between $1,000,000 and $49,999,999
**More than $50,000,000**
Equitable Relief
Other (if so, specify) _____

**Bayer does not agree that this estimate is the value of Plaintiffs' claims.**

**(b) Estimated amount of Defendant(s)' Counterclaim/Cross-Claims:**
Less than $100,000
Between $100,000 and $999,999
Between $1,000,000 and $49,999,999
More than $50,000,000
Equitable Relief
Other (if so, specify) _*No Counterclaim*_____

(2) **Competence.** Counsel certify that they are sufficiently knowledgeable in matters relating to their clients' technological systems to discuss competently issues relating to electronic discovery, or have involved someone competent to address these issues on their behalf.

*All parties so certify*

(3) **Meet and Confer.** Pursuant to Fed. R. Civ. P. 26(f), counsel are required to meet and confer regarding certain matters relating to electronic discovery before the Initial Pretrial Conference (the Rule 16 Conference). Counsel hereby certify that they have met and conferred to discuss these issues.

Date(s) of parties' meet-and-confer conference(s):

*The parties met in person on July 24, 2013.*

*In addition, there have been numerous telephone conference calls and exchanges of emails, some by the co-lead counsel of the litigation, to discuss all issues, and conference calls and exchanges of emails by smaller groups on individual issues.*

(4) **Unresolved Issues:** After the meet-and-confer conference(s) taking place on the aforementioned date(s)**,** the following issues remain outstanding and/or require court intervention:

Outstanding but parties continue to work and not ripe for judicial interventionSearch and Review – *See section 6(b) below*;
Source(s) of Production  ;
Form(s) of Production
Identification or Logging of Privileged Material
Inadvertent Production of Privileged Material - Cost Allocation;
Other (if so, specify) _____. To the extent specific details are needed about one or more issues in dispute, describe briefly below.

As set forth below, to date, the parties have addressed the following issues:

(5) **Preservation.**

**(a) The parties have discussed the obligation to preserve potentially relevant electronically stored information and agree to the following scope and methods for preservation, including but not limited to: retention of electronic data and implementation of a data preservation plan; identification of potentially relevant data; disclosure of the programs and manner in which the data is maintained; identification of computer system(s) utilized; and identification of the individual(s) responsible for data preservation, etc.**

Plaintiff(s):

*Plaintiffs' documents are generally in the possession of third parties (for example, medical records and work records) and therefore are preserved independent of these proceedings.  Plaintiffs have agreed to provide authorizations to permit Defendants to obtain copies of these records from the source.  In addition, at Defendants' request, Plaintiffs' counsel has been advised to put all Plaintiffs on notice to preserve personal notes, diaries etc, whether electronic or paper and social media postings related to Mirena use or physical condition resulting therefrom.*

Defendant(s):

*Bayer HealthCare Pharmaceuticals ("BHCP") issued a legal hold on April 5, 2007 mandating that all of its employees preserve documents relating to the marketing, distribution, sale, production, manufacture, research or development of Mirena.  Reminder notices were sent periodically thereafter with the most recent notice being sent on January 9, 2013.  Further, the Mirena hold is sent quarterly to new employees.*

**(b) State the extent to which the parties have disclosed or have agreed to disclose**

2

**the dates, contents, and/or recipients of "litigation hold" communications.**

> *Plaintiffs have not disclosed or agreed to disclose the dates, contents or recipients of "litigation hold" communications.  They have also not verified that they have issued any "litigation hold" at all.*
> *Plaintiffs request further information on the Defendants "litigation hold" communications. While the communication itself may be privileged, the actions taken by recipients in response to the litigation hold, and the categories of documents subject to the hold are discoverable. The statement provided by Defendants on June 25 is insufficient by itself.  Defendants have in good faith given further information orally in meet and confer discussions and Plaintiffs simply need written affirmation of these items.*

> *Defendant provided  information about the date, contents and recipients of the "litigation hold," Defendant has not provided copies of the "litigation hold" communications, asserting attorney client and work product privilege. This issue is not ripe for judicial intervention.  Plaintiffs have not asked any specific questions about preservation, and Bayer has not refused to answer any specific questions in writing.  Defendant provided information in response to Plaintiffs' requests*

**(c) The parties anticipate the need for judicial intervention regarding the following issues concerning the duty to preserve, the scope, or the method(s) of preserving electronically stored information: Not at this time**

**Plaintiffs' Position:**

**Defendant's Position:**

 .


**(6) Search and Review**

**(a) The parties have discussed methodologies or protocols for the search and review of electronically stored information, as well as the disclosure of techniques to be used.  Some of the approaches that may be considered include:  the use and exchange of keyword search lists, "hit reports," and/or responsiveness rates; concept search; machine learning, or other advanced analytical tools; limitations on the fields or file types to be searched; date restrictions; limitations on whether back-up, archival, legacy, or deleted electronically stored information will be searched; testing; sampling; etc.  To the extent the parties have reached agreement as to search and review methods, provide details below.**

Plaintiff(s):

*Plaintiffs have been advised to retain all electronic and social media references to Mirena or their physical condition during the relevant period as defined in the Plaintiff Fact sSheet. Plaintiffs will produce these in response to the fact sheet as PDFs.*

Defendant(s):

**On June 25, 2013 Defendant provided the following information:**

**BHCP's in-house and outside counsel have interviewed BHCP's employees to determine individuals who are or have been significantly involved with Mirena. When a decision is made to collect an employee's custodial file, a second interview is conducted to determine the existence and location(s) of potentially responsive documents.   When the employee's hard drive is identified as a source, BHCP collects the data from that employee's hard drive using Robocopy to collect the following file types:**

**\*.doc**
**\*.docx**
**\*.docm**
**\*.docxml**
**\*.dochtmi**
**\* .xls**
**\* .xlsx**
**\*.xlsm**
**\*.xlsxml**
**\*.xlshtml**
**\*.ppt**
**\*.pptx**
**\*.pptm**
**\*.pps**
**\*.ppsm**
**\*.ppsx**
**\*.pptxml**
**\*.ppthtmi**
**\*.sldm**
**\* .sldx**
**\*.mpp**
**\*.mdb**
**\*.pdf**
**\*.nsf**
**\*.rtf**
**\*.txt**
**\*.wpd**

4

*\*.vdx*
*\*.vdw*
*\*.vsd*
*\*.zip*
*\*.one*
*\*.onepkg*
*\*.odt*
*\*.ods*
*\*.odp*
*\*.CSV*
*\*.xml*
*\*.7Z*
*\*.xps*
*\*.msg*
*\*.pm*
*\*.eml*
*\*.pst*

*Defendant provided assurances that these were all possible file types and there was no proprietary or unique file types not included.*

*For e-mail, the employee's e-mail box is collected from BHCP's server.  In addition,*
*counsel works with the employee to identify potentially relevant hard copy and media files and those documents are collected, scanned/copied, and returned to the custodian. BHCP sends the information and documents collected from the employees to its ESI vendor, Kroll Ontrack ("Kroll"). Kroll processes the data to prepare it for loading to its review platform, Ontrack Inview.   Processing includes de-duplication of the data. Deduping is done globally (i.e., within and across custodians) using SHA (160-bit hash value).  A field is created that tracks where duplicate documents reside. BHCP will produce this data field to plaintiffs.*
*Kroll also runs a Boolean keyword search utilizing the search terms that Defendant provided to Plaintiffs onMay 15,2013. The list of search terms is as follows:*

*Mirena OR*
*MerenaOR*
*Merino OR*
*"LNG 20" OR*
*"LCS 20" OR*
*"ICS 20" OR*
*"LNG-20" OR*
*"LCS-20" OR*
*"IUS-20" OR*
*"21-225" OR*
*Intrauterine OR*
*Interuterine OR*
*"Inter-uterine" OR*

5

*Interuterus OR*
*"Inter-uterus" OR*
*Intrauterus OR*
*"Intra-uterus" OR*
*"Intra-uterine" OR*
*IUD OR*
*IUS OR*
*IUCOR*
*levonorgestrelOR*
*LevonorgestrolOR*
*Levonorgesterone OR*
*Levonorgestin OR*
*Levo OR*
*NorgrestrelOR*
*"Levo-norgestrel" OR*
*"Levo-norgesterol" OR*
*"Levo-norgestin" OR*
*"LNG-IUS" OR*
*"Levonorgrestrel interuterine contraceptive system" AND NOT*
*((Skyla OR Jaydess OR "Low-dose Levonorgestrel Contraceptive System" OR*
*LCS) AND NOT (Mirena OR Merena OR Merino OR "LNG 20" OR "LCS 20"*
*OR "ICS 20"OR "LNG-20" OR "LCS-20" OR "IUS-20"))[defendants have stated*
*that this search term is inclusive not exclusive*

*To the extent there is a hit based on this keyword search, Kroll includes the*
*document and its entire family in the potential review set for outside counsel.*
*Defendant validated the keyword search terms.*

*On July 24, 2013, Plaintiffs provided an additional list of search terms after an*
*agreement by the parties regarding a protective order relating to the Baugh*
*documents and having a chance to do a cursory review of those documents.*
*Defendant agreed to add these search terms to the filter.*
*The list is as follows:*

1. *Levonova*
2. *LNG20*
3. *mirena-us*
4. *mirenas*
5. *mirenae*
6. *mirenao*
7. *imirena*
8. *ind 22,697*
9. *IND w/2 Report*
10. *lng-releasing*
11. *lng-iud*
12. *lng-iuds*

6

*13. lng-containing*
*14. iuds*
*15. lng-iud*
*16. iud-related*
*17. iud-associated*
*18. lng-ius*
*19. iuss*
*20. ingius*
*21. ius-related*
*22. iucs*
*23. iucd*
*24. levonorgestrel-releasing*
*25. levonorgestrelcontaining*
*26. levonorgestrel-iud*
*27. levonorgestrel-intrauterine*
*28. adhesion formation*
*29. uterine perforation*
*30. perforat!*
*31. migrat!*

**On July 30, 2013, Defendant informed Plaintiffs  that it will run the 31 additional
search terms requested by Plaintiffs on the "non-hit" documents on custodians
already searched and on databases and other non-custodial sources of documents.**

**Defendant stated that  it  de-deduplicates documents within and across custodians
using SHA (160-bit hash value).  The de-deduplication process identifies exact
duplicates.  Defendant will create a data field to track duplicates and will provide
that field to Plaintiffs so they know every custodian whose file contained a copy of
the duplicate.  Defendant also confirmed that if a document contains marginalia, it
will not be considered a duplicate even if the text is exactly the same.**

**For the fourteen custodians identified below, Defendant offered to produce a
custodial file, as applicable, and available, from hard copy files maintained by the
individual, the computer hard drive and other media (CDs, DVDs, jump drives) of
the individual, the individual's e-mail file, and the individual's home share file on
file share servers.**

*Defendant also offered to produce certain data from databases identified in the June
25, 2013 letter to Plaintiffs.   These databases include:*

**1. Consumer and healthcare provider inquiries and complaints regarding Mirena.**

**2. Documents relating to Mirena that are responsive to [plaintiffs'] requests for:**

      **a. Investigational New Drug Application ("IND"), New Drug Application
("NDA"), and Supplemental New Drug Applications for Mirena;**

7

*b. Communications and contacts with the FDA regarding Mirena;*

*c. Published and unpublished reports of Bayer's preclinical and clinical studies involving Mirena;*

*d. Company Core Data Sheets for Mirena;*

*e. Periodic Safety Update Reports ("PSURs") for Mirena;*

*f. Investigator's brochures contained in the NDA and its supplements;*

*g. Mirena U.S. package inserts;*

*h. Documents related to patents for Mirena that are contained in the NDA;*

*i. Mirena-related Dear Healthcare Provider letters issued in the U.S.;*

*j. Documents submitted to the FDA related to BfArM's inquiries related to Mirena;*

*k. Documents submitted to the FDA related to the French regulatory authority's inquiries related to Mirena;*

*l. Documents comparing Mirena to Skyla® (Clinical Study 308901 entitled, "A Completed Phase II study with 738 Women Exposed to Two Doses of LCS and Mirena);*

*m. Interim reports of the EURAS study involving Mirena that are contained in the PSURs; and*

*n. Information from the PSURs reflecting the number of patients to whom Mirena has been administered.*

*3. Draft and final versions of U.S. marketing and promotional materials related to Mirena. These documents will be responsive to your requests for:*

*a. Information regarding WWW.Mirena.com, \wwW.Mirena-us.com, and other U.S. digital marketing and promotional materials;*

*b. U.S. promotional and marketing materials;*

*c. Exemplars of the Mirena advertisements to U.S consumers and U.S. professionals including physicians;*

*d. Exemplars of Mirena-related items used in the U.S. that included warnings*

8

*that sales representatives provided to physicians;*

*e. Exemplars of Mirena-related materials provided to U.S. physicians for use in speeches, including slide decks, notes, and handouts; and*

*f. Mirena-related materials used for training U.S. sales representatives.*

**4.** *Mirena Adverse Event Data involving reports of perforation, embedment, or migration.*

*5. Documents relating to U.S. sales representative development and training activities regarding Mirena.*

*6. Records of sales calls made by U.S. sales representatives to U.S. healthcare providers who prescribed or administered Mirena to plaintiffs in this litigation. This information will be produced on a plaintiff-by-plaintiff basis along with responses to a Defense Fact Sheet, to be agreed upon between the parties. This database may also inform on [plaintiffs'] requests for:*
*a. Tangible items regarding Mirena, if any, provided to physicians who prescribed or administered Mirena to plaintiffs.*

*7. Meeting minutes, if any, for Bayer's boards and executive committees related to Mirena.*

*8. Data concerning orders for Mirena placed by U.S. healthcare providers who prescribed or administered Mirena to plaintiffs in this litigation and information regarding shipment of training kits to those U.S. healthcare providers. This information will be produced for individual prescribers on a plaintiff-by-plaintiff basis along with responses to the Defense Fact Sheet.*

*Plaintiffs' Position:*
*With respect to the above, Plaintiffs will need certain information provided by answers to interrogatories and Requests for production of documents along with Rule 30(b)(6) depositions to confirm exactly what information (scope and content) plaintiffs will be receiving.  For example, for adverse event reports, will plaintiffs receive the information entered into the database or all information received regarding a particular reported adverse event.*

*Defendant's Position:*

*Defendant has provided extensive information in response to Plaintiffs' questions about the sources of data and databases in an effort to reach an informal agreement about the scope of discovery.  Defendant does not believe that formal discovery requests are necessary given the level of detail*

9

*it has provided to Plaintiffs.  Nonetheless, when Defendant receives any requests, it will review and respond to them in accordance with the Federal Rules.*

*Defendants have advised Plaintiffs that the search terms were applied to custodial files and not over the entire email server or servers. The parties are continuing to discuss the scope of the search and this issue is not ripe for judicial intervention at this time.*

*Plaintiffs have also requested information regarding what they believe to be potentially relevant Bayer databases, "Sharepoints", servers,r rooms, and groups/committees. Plaintiffs will provide any information about where they obtained information about these items or any other context that could assist Bayer in investigating their request. Plaintiffs will also send requests for production regarding these.  Defendant will await Plaintiffs' formal discovery requests and will respond to them in accordance with the Federal Rules.* The parties ar eworking in good faith on these issues and they are not ripe for judicial intervention at this time.

**(b) The parties anticipate the need for judicial intervention regarding the following issues concerning the search and review of electronically stored information:**

*Predictive Coding: Plaintiffs' Position.*

*Defendants have stated: "In preparing for and conducting the document review for possible production to plaintiffs, we consider and, as appropriate, utilize various Kroll tools for more efficient and consistent document review and production.  These tools may include e-mail threading, near duplication, and Kroll's proprietary Intelligent Prioritization and Intelligent Categorization. Importantly, BHCP does not use these tools, in the absence of human review, to identify responsive or non-responsive documents." Plaintiffs believe that this information needs to be clarified despite Defendants' good faith efforts to explain. Plaintiffs have proposed using "machine learning, or other advanced analytical tools" such as predictive coding, to produce a smaller and more relevant initial production and save time and money for both sides.  It appears to the PSC from the above that these advanced analytical tools  may have been used by Defendants. Plaintiffs' understanding of this application is, as follows, from Kroll's web release:*

With Automated Workflow, Intelligent Prioritization and Intelligent Categorization, clients can achieve greater than 50 percent costs savings on review. Kroll Ontrack IRT works in four steps:

1. **Train:** Lawyers designated as "trainers" review documents and determine whether they are responsive, non-responsive, privileged or some other pre-defined category.
2. **Learn:** IRT analyzes reviewer category decisions made by trainers to identify and elevate documents that are most likely relevant and suggest categories for documents not yet reviewed.

3.   **Evaluate:** Reviewers make categorization decisions, leveraging intelligent suggestions.
4.   **Validate:** IRT is fully transparent with real-time reports and metrics available to optimize the technology and experience cost savings.

"Traditional linear review is no longer tenable. The manual aspect of document review inherently produces inaccuracies and inconsistencies in categorization decisions, which hinders the implementation of a repeatable, defensible process," said Michele Lange, director of discovery, Kroll Ontrack. "IRT in the Ontrack Inview tool is unique when compared to other tools because it automatically selects and presents sample documents for your review team versus a review team conducting manual, iterative, time-intensive searches to find key documents from which to learn. Furthermore, Kroll Ontrack IRT learns while you work and empowers the defensibility of your arguments with transparent reports and real-time metrics. Kroll Ontrack is truly leading a revolution that is going to change the face of legal discovery."

*Plaintiffs' understanding is that the Kroll process was used to prioritize the human review (which also reviewed for privilege) and plaintiffs would like the participate in that prioritization. Defendants have said they will produce documents but that they do not wish to participate in use of machine learning and advanced analytics such as predictive coding or Intelligent Prioritization and Categorization. On August 6, 2013, Defendant clarified that Intelligent Categorization and Prioritization was not used. Rather, a software application called Workflow was used. Plaintiff cannot find information on Workflow and has asked for further clarification. Plaintiffs found information on Kroll Ontrack Workflow Professional Services which uses the application Ontrack Inview TM. This appears to Plaintiffs to be similar to Intelligent Prioritization and Categorization. . On August 8, 2013, Defendant informed plaintiff that the Ontrack Inview software was used only as a docment platform and no adavanced analytis, intelligent prioritization, intelligent categorization or predictive coding was used on the documents before human review. The PSC has not yet been able to meet with this new information and determine how it effects the PSC interest in the possibility of using software applications in the document production process.*

*Predictive Coding: Defendant's Position*

*Defendant's use of keyword search terms complies with the Federal Rules of Civil Procedure. Plaintiffs do not, and cannot, argue that Bayer's method is noncompliant with the Rules. Litigants have used this method for years, including in the vast majority of mass tort litigations like this one, and no court has found keyword searching to be noncompliant. Nor has any court ever required a litigant over its objection to use predictive coding instead of keyword search. Neither the Rules nor the Advisory Committee Notes or Sedona Conference principles would support such a ruling, which would uproot thousands of protocols throughout the country.*

*Bayer has used its keyword search method throughout the Mirena litigation, including in the extensive Baugh and Osborne document productions, and has spent millions of dollars to do so. Plaintiffs have not objected to the keyword search terms themselves. Nor could they, given that the search terms are sufficiently broad to capture potentially responsive materials and have been validated as such. Defendant can produce millions of pages in short order using this reasonable method.*

*To the contrary, it is not reasonable to require Defendant to start over with predictive coding and would only serve to delay document production and increase both parties' costs. Contrary*

*to Plaintiffs' statement above, Defendant has clarified to Plaintiffs that Defendant has not used any of the predictive coding tools that Plaintiffs refer to, and does not intend to do so in this litigation.  Plaintiffs' proposed protocol for predictive coding, which they first provided to Defendant on July 21, would undo the progress that has been done and prolong discovery indefinitely.  Under Plaintiffs' complicated proposal, the parties would go through multiple preliminary steps to train the vendor's software to be able to recognize potentially relevant documents.  The proposal also calls for the parties to retain statistical experts to perform statistical sampling will be used at every step of the process and then debate the statistical significance of the results. Finally, after the predictive coding process is complete, Bayer will still review the results of the computer's predictive coding to determine whether the documents are responsive, privileged and whether they must be redacted.  Each of these steps must be re-applied if a new document source (e.g., an additional Bayer employee's file) is identified.*

*Plaintiffs' proposed multi-tiered process will substantially prolong the document production process and will delay the resolution of this litigation.  A similar process recently lasted over a year in the Actos Litigation.  Plaintiffs' proposal belies Rule 1 as it will not "secure the just, speedy, and inexpensive determination" of this litigation.  Defendant's keyword search is reasonable and complies with the Federal Rules.*

*The parties are currently discussing have not yet agreed on date restrictions or whether back-up, archival, legacy, or deleted electronically stored information will be searched.*

*Plaintiffs has expressed a  concern with sharepoint information such as department shares, SharePoint sites, document management systems, and databases. Plaintiffs have stated; "Plaintiffs need to know how these shared locations are populated, maintained, and used by the custodian and other team members." Defendants have responded with respect to instant messaging done in Lotus Notes' Smarttime and Outlook Lync, by indicating that instant messages in those applications delete as soon as the conversation ends, so that data cannot be available.  Defendants will address these questions in response to any formal discovery request served by Plaintiffs. This issue is not ripe for judicial intervention.*

*Plaintiffs have requested that the names of key foreign employees be also used as search terms. Plaintiffs have not yet received a response on this request. These search terms include*

**Hannu Allonen**
**Pirjo Sallinen**
**Hannele Savonius**
**Pirjo Inki**
**Juliane Schoendorf**
**Kimmo Jaakkola**
**Ute Bornemann**
**Petra Koelm**
**Harri Tapani Halajarvi**
**Heikki Voipio**

**As these names are unique plaintiffs requests each name be run separately (first and last name separately) and that the e mail address of these individuals while employed by Bayer's European entities or predecessors also be run as search terms in the U.S document.**

12

**collection*. Plaintiffs have also requested information on a number of Bayer databases, rooms,
servers, groups and committees. Because this information came form confidential documents,
they are not listed here.***

**(7) Production**

(a) Source(s) of Electronically Stored Information. **The parties anticipate that
discovery may occur from one or more of the following potential source(s) of
electronically stored information [e.g., email, word processing documents,
spreadsheets, presentations, databases, instant messages, web sites, blogs,
social media, ephemeral data, etc.]:**

Plaintiff(s):

**For purposes of this document, it is the same as 6(b) above except for custodians**

Defendant(s):

While Defendant has provided information about its sources of electronically stored
information, Plaintiffs have not yet done so.

**(b)** Limitations on Production. **The parties have discussed factors relating to the
scope of production, including but not limited to: (i) number of custodians;
(ii) identity of custodians; (iii) date ranges for which potentially relevant data
will be drawn; (iv) locations of data; (v) timing of productions (including
phased discovery or rolling productions); and (vi) electronically stored
information in the custody or control of non-parties. To the extent the
parties have reached agreements related to any of these factors, describe
below:**

Plaintiff(s):

*Plaintiffs have proposed that Defendants produce the files of 22 employees and after a
reasonable period of time to review the documents associated with all custodians,
propose any additional requests for custodial files.  Defendants have agreed to produce
14 custodians.  The plaintiffs have requested 8 additional custodians listed below and
may ask for more depending on Defendants discovery responses. :*

*Sharon Brown*
*Brenda Marczi*
*Herman Ellman*
*Nancy Konnerth*
*Ilene Schwartz*
*Julia Friedman*

*Jennifer Grohman*
*Russell Barrans*

Defendant(s):

*By letter of June 25, 2013, Defendant  agreed to produce documents from the custodial files of 14 custodians whose positions were described in that letter.  These custodians are current or former Bayer Healthcare Pharmaceuticals Inc. employees with Mirena-related responsibilities in five categories: sales/sales training; marketing; medical affairs; regulatory and pharmacovigilance.  These individuals have or had relevant knowledge or core responsibility for Mirena.  Defendant also agreed to provide certain data from databases discussed above.*

*Defendant proposed to Plaintiffs limitations on the number of custodians, but Plaintiffs informed Defendant that they were unwilling to agree on any prospective limits on custodial files or other document sources.  Because the parties were unable to reach an agreement setting prospective limits on discovery, Plaintiffs will serve formal discovery requests.*

**(c) Form(s) of Production:**

**(1) The parties have reached the following agreements regarding the form(s) of production:**

*The parties are near agreement on the Forms of production.  The parties will file a proposed Case Management Order related to the document production format and a letter addressing any remaining issues on Friday, August 9.*

Plaintiff(s):

Defendant(s):

**(2) Please specify any exceptions to the form(s) of production indicated above (e.g., word processing documents in TIFF with load files, but spreadsheets in native form):**

**(3) The parties anticipate the need for judicial intervention regarding the following issues concerning the form(s) of production:**

**(d)** Privileged Material.
**(1) Identification. The parties have agreed to the following method(s) for the identification (including the logging, if any, or alternatively, the disclosure of the number of documents withheld), and the redaction of privileged documents:**

**The parties are discussing a proposed protocol for privilege logs. Defendant has proposed a privilege log format based on the Pilot Project.**

**(2) Inadvertent Production / Claw-Back Agreements. Pursuant to Fed R. Civ. Pr. 26(b)(5) and Fed. R. Evid. 502(e), the parties have agreed to the following concerning the inadvertent production of privileged documents (e.g., "quick-peek" agreements, on-site examinations, non-waiver agreements or orders pursuant to Fed. R. Evid. 502(d), etc.):**

*Not agreed as yet. The parties are discussing a proposed claw-back provision.*

**(3) The parties have discussed a 502(d) Order.** *No*

**The provisions of any such proposed Order shall be set forth in a separate document and presented to the Court for its consideration.**

(e) Cost of Production. **The parties have analyzed their clients' data repositories and have estimated the costs associated with the production of electronically stored information. The factors and components underlying these costs are estimated as follows:**

**(1) Costs:**

Plaintiff(s):
Defendants are required to bear the costs of producing their documents. The MDL process provides the Defendant with a huge cost saving in that they provide discovery responses to only one plaintiffs' entity instead of having to respond in hundreds of cases, they only hav eot produce documents one time, instead of many times and their employees are deposed only once instead of many times in many different cases. In exchange for these cost savings, Defendants in MDL proceeding have always be required to bear the costs of production, as does any defendant or plaintiff in any litigation. Defendant(s):

Defendant has offered to bear its own costs for the production of documents and data detailed in its June 25, 2013 letter. In lieu of formal discovery, Defendant proposed that Plaintiffs request a certain number of additional custodians after reviewing Defendant's production, and then Plaintiffs would bear the production costs related to any additional custodians beyond that limited additional number. Plaintiffs rejected this proposal and have informed Defendant that they intend to serve formal discovery requests.

Depending on the scope of the formal discovery requests Plaintiffs serve, Defendant may request that costs be shifted to Plaintiffs in accordance with the proportionality doctrine of Rule 26(b)(2)(C). Cost-shifting has been used in similar litigations as an effective

means of allowing Plaintiffs to pursue discovery they believe is necessary without unduly burdening the Defendant.

**(2) Cost Allocation. The parties have considered cost-shifting or cost-sharing and have reached the following agreements, if any:**

**(3) Cost Savings. The parties have considered cost-saving measures, such as the use of a common electronic discovery vendor or a shared document repository, and have reached the following agreements, if any:**

**(f) The parties anticipate the need for judicial intervention regarding the following issues concerning the production of electronically-stored information:**

**(8) Other Issues:**

***The parties are close to an agreement on a Plaintiff's Fact Sheet and a Defendant's Fact Sheet. The parties will submit these along with related Case Management Orders on Friday, August 7, and will address any remaining issues in a letter to the Court.***

16