D8eimirc ag                    CONFERENCE

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MIRENA PRODUCTS LIABILITY
    LITIGATION,
4                                      13 MD 2434 CS

5   ------------------------------x

6                                      White Plains, N.Y.
                                       August 14, 2013
7                                      9:45 a.m.

8   Before:

9                      HON. CATHY SEIBEL,

10                                     District Judge

11                      APPEARANCES
    FRED THOMPSON III
12  MATTHEW J. McCAULEY
    DIOGENES P. KEKATOS
13  CARMEN SCOTT
    JAMES RONCA
14  TINA GLANDIAN
    JESSICA VERTULLO
15       Attorneys for Plaintiff

16  SHAYNA S. COOK
    WILLIAM HARRINGTON
17  JAMES SHEPHERD
         Attorneys for Defendant
18
    STEERING COMMITTEE:
19  STEVE FARIES, CATHERINE HEACOX
    (By phone) RACHEL ABRAMS, RICHARD ARSENAULT, DAWN
20  CHMIELEWSKI, YVONNE FLAHERTY, MICHAEL JOHNSON, MARC GROSSMAN
    (for RANDI KASSAN), SHELLY KAUFMAN, BRIAN FOX (for FRED
21  LONGER), DAN GALLUCCI (for DIANNE NAST), ROGER SMITH

22

23                      CONFERENCE

24

25

1          THE COURTROOM DEPUTY:  Mirena products liability

2     litigation.

3          THE COURT:  Good morning, everyone.  Let me put on the

4     record who I understand is here.  Mr. Thompson, good morning,

5     Mr. McCauley, good morning, Mr. Kekatos, Mr. Ronca, and

6     somebody new.

7          MS SCOTT:  Carmen Scott, your Honor.

8          THE COURT:  Good morning to you.  And I'm told on the

9     phone we have Ms Abrams, Mr. Arsenault, Mr. Chmielewski,

10    Ms Flaherty, Mr. Johnson, Mr. Grossman standing in for

11    Ms Kassan, Ms Kaufman, Mr. Fox for Mr. Longer, Mr. Gallucci for

12    Ms Nast and Mr. Smith.  And in the back I gather we have

13    Ms Glandian, Ms Vertullo.  And is that everyone on plaintiff's

14    side?  And Mr. Faries is here too, and Ms Heacox.  And Ms Cook,

15    Mr. Shephard and Mr. Harrington.  Good morning to you all.

16         Judge Smith could not be here, she has criminal duty

17    and a meeting in the city.  If you are still around this

18    afternoon and want a few minutes of her time, you can call her

19    chambers.  She actually may be able to set some time aside.  I

20    don't know if you are all running to the airport right after

21    this or not.

22         Okay.  I've gotten in the last few days Ms Cook's

23    August 7th letter, the pilot project Exhibit B statement, and

24    two more letters from Ms Cook dated the 9th and the 12th.  And

25    each letter seems to show you inching either a little closer to

1   resolution of certain issues or the need for me to help you

2   along.  But let me, since it's now the 14th and you've been

3   making progress every day, let me turn to you Ms Cook and ask

4   you what you think it would be profitable for us to address

5   this morning.

6          MS COOK:  We have been working very hard, spent a lot

7   of time talking to each other over the past weeks.  And we

8   still have the two areas that we're still not in agreement on

9   on the schedule and then there are three issues on the

10  defendant's fact sheet that still remain.

11         THE COURT:  Okay.  Why don't we talk about those.  Let

12  me find my notes on your schedule.  It looks like, well, there

13  was one date you were in agreement on.  Everybody agrees the

14  initial disposition pool should be April 4th.  Everything else

15  you were somewhere between three and six months apart with

16  plaintiffs on some things, well, it looks like actually on just

17  about everything, thinking things are going to take a little

18  longer than defendants.  Why don't you start with what you

19  think makes sense, Ms Cook, and then I'll hear from plaintiffs

20  on why they disagree.

21         MS COOK:  Thank you, your Honor.  Well, the parties

22  are actually not that far apart in terms of the generic

23  discovery deadline.  We propose March 3rd which would give us

24  seven months of discovery.  We are ready to produce millions of

25  pages as soon as we get an ESI protocol in place which we're

D8eimirc ag                    CONFERENCE

1    still discussing and negotiating and meeting and conferring on.

2    And I would ask, or I believe that we have agreed that we'll be

3    ready to submit that by next Friday.  And if there are any

4    issues, we can flag those for the Court.

5              Once we get that protocol in place, we're ready to

6    start producing documents.  We've already produced 1.7 million

7    pages in the Baugh and Osborne cases as we discussed, and under

8    an agreement that we have with plaintiffs' counsel, they have

9    had access to those documents by signing the protective order

10   that was in place in that case.  So at this point, having as

11   much knowledge as the plaintiffs have about which witnesses are

12   important and the documents, we believe that they can be really

13   targeted on what they think they're still missing.  And they'll

14   get millions more pages from us as soon as we have a protocol

15   in place and can start producing the additional custodians that

16   we've agreed to produce.

17             So based on what we're ready to do in terms of

18   document production, we can start depositions in a couple of

19   months.  That would give us several months for depositions.

20   And just given the number of witnesses involved and the size of

21   the litigation, the value of the cases, we believe that seven

22   months is sufficient time for generic discovery.

23             THE COURT:  You think the millions of documents can be

24   reviewed in time for depositions to start in a couple of

25   months?

1          MS COOK:  Yes, I do, just based on what we understand

2     the plaintiffs' document review team, from what they've told us

3     about the team that they have in place.

4          THE COURT:  Who wants to tell me from plaintiffs' side

5     why you think it should be six months after that?

6          MR. RONCA:  Good morning, your Honor.  The reason that

7     we worked out the schedule and proposed it in that way is

8     because what the defendants are requesting we do is just simply

9     impossible.  Yesterday or the day before we had to have a

10    special review of documents in Washington in another case, so I

11    was there personally reviewing documents with seven other

12    people.  So I had a personal indication confirming my other

13    calculation of how long it takes to review documents.  So seven

14    people over two days were able to review 22,000 pages.  These

15    were higher level reviewers than you normally have.  Partners

16    and very experienced associates reviewing documents in a

17    litigation that they knew about.

18          The basic average for those people was 250 pages an

19    hour.  If you calculate that out, it is impossible to even

20    review the documents that they're promising us in that seven

21    month time period let alone review them sufficiently to take

22    depositions.

23          THE COURT:  Was the review you were doing the first

24    cut, or has somebody junior --

25          MR. RONCA:  No, this was the first cut.  We need to do

1    a first cut on all these documents coming from the other side.

2    The one problem is that defendants propose that we review all

3    these documents in two months and then start taking depositions

4    and a number of documents we don't even have yet.

5            In addition, we don't want to start depositions until

6    at least we have some broad-base review of the documents

7    because there may be some documents that interface between

8    witnesses, and then we'll be coming back to the Court and

9    saying, we want to retake this witness because we got documents

10   later that have to do with this witness, or have to do with a

11   meeting this witness attended, or meeting minutes or

12   handwritten notes that relate to this witness.  We want to take

13   depositions only one time after a fair review of the documents.

14           In addition, we were not able to come to agreement on

15   what was to be produced.  So we had to revert towards filing

16   request for production of documents and interrogatories.  Those

17   were served on August 8th.  The reason we had to do that is

18   because we couldn't get actual confirmation of what documents

19   we were getting in a written form that we thought was

20   sufficiently reliable that we could represent to the steering

21   committee and to our clients that we had enough coverage, that

22   we were getting a complete set of documents.

23           So those were just served.  We need the answers to

24   those and we will need 30(b)(6) depositions to assure ourselves

25   that we have the right types of documents.  The defendants in

D8eimirc ag                    CONFERENCE

good faith have offered certain types of documents and they've

offered us the custodial files of 14 people who they say are

the key witnesses.  And I'm sure that they believe that they're

the key witnesses but we may disagree on who the key witnesses

are.  We asked for eight additional people.  We haven't come to

an agreement on that.  So there's an additional time frame the

defendants haven't built in for answering the interrogatories

and requests for production and having 30(b)(6) depositions

after that so that we can assure ourselves of the nature of the

documents we are receiving, we can assure that we have received

them in the manner that they were used in the business of Bayer

as opposed to in some way -- I'll give you an example to make

it easier.

         The adverse event database is proposed to be given to

us in limited form on an Excel spreadsheet.  We don't know if

that's the way it was used in the company or if all the

information on the Excel spreadsheet displays the same way that

it displayed to the company in whatever database software they

use for that particular database.  So without talking to an IT

person and being able to ask questions and follow-up questions,

we don't have an understanding of what we're getting.

         And this is the typical process that's been done in

any number of other MDLs in the past.  Interrogatories,

requests for production, 30(b)(6) depositions.  So we need time

in the schedule for that.  We'll be reviewing documents the

1    whole time that's going on.  But some time has to be build into

2    the schedule for that.

3           The other thing is, and this was mentioned at the last

4    conference, is that there are foreign witnesses that are very

5    important to this litigation.  The foreign entities have not

6    been served yet.  That's a process that takes three or four

7    months and is extremely expensive, even to serve one defendant

8    under the Hague Convention.  And until -- we're told that until

9    we have service, there aren't any lawyers here to speak for

10   those companies, and we don't know if we can get the documents,

11   we don't know what we could be getting, and we don't know when

12   and under what circumstances we will be getting depositions of

13   witnesses who probably live in Finland or Germany.  So we need

14   time in the schedule to do that.

15          In fact, in the last conference, the Court mentioned

16   and all sides agreed that somewhere along the line the schedule

17   is going to have to be adapted to take into account the foreign

18   defendants as soon as we get lawyers here in the courtroom who

19   represent those defendants.

20          THE COURT:  Now you're making it seem like December

21   2014 is ambitious.

22          MR. RONCA:  I thought it was ambitious to be honest.

23   I don't think there's any fat in that schedule at all.

24          THE COURT:  Any last words, Ms Cook?

25          MS COOK:  Yes, your Honor.  Some of the issues that

1    were raised go to the scope of production and the format of

2    production, and those are issues that we are continuing to

3    discuss and we will continue to discuss.  And it's true that we

4    offered several ways to come to an informal agreement on the

5    scope of production and were unable to come to an agreement

6    with the plaintiff because they did not want to be limited from

7    requesting additional witnesses.  But that doesn't impact the

8    schedule.  These preliminary steps, we're going to be producing

9    documents at the same time that we're going to be responding to

10   the requests that they've already served.  As to the 30(b)(6)

11   depositions, the plaintiffs proposed the deadline for those to

12   be November 1st.  And as they said, they will be reviewing

13   documents that entire time, even up through the time that they

14   finish taking any 30(b)(6) depositions that they want to take.

15   So even after that process is over, the proposal that we put

16   forth still gives them several more months to take additional

17   company depositions.

18            THE COURT:  I think that the problem is the 30(b)(6)

19   depositions may result in a new round of document requests

20   because that's when they're going to cement their

21   understanding, if it can't be done informally sooner, of what

22   else there is and where it was kept and all that.  As I think

23   I've now said at each of our conferences, nobody wants this

24   over with expeditiously more than I do, but it's inconceivable

25   to me that generic discovery will be done by March and I would

D8eimirc ag                    CONFERENCE

1    just have to end up having to extend.

2            I do expect plaintiffs' team to get through more than

3    250 pages an hour and I expect it to be a large team.  But I

4    just think defendants' proposal is too ambitious.  And maybe

5    some of the problems Mr. Ronca foresees will not come to pass.

6    Maybe other ones we're not foreseeing will come to pass.  But I

7    think September 1 is reasonable.  It's not impossible that

8    we'll end up having to extend that, but I really think it could

9    be done by September.  I don't think it could be done by March.

10           So assuming that is the generic fact discovery cutoff,

11   do the remaining dates fall into place or are there others --

12   in other words, are the differences in the other dates you

13   proposed all keyed off of the differences in that particular

14   cutoff, or are there other things where you're really miles

15   apart on how long things are going to take.

16           MS COOK:  There are other things.  One deadline -- for

17   example, given that the initial disposition pool will be

18   selected in April, and there will then be several more months

19   before the end of discovery, I see no reason why case-specific

20   discovery should not end on September 1st as well.

21           Then there are the expert dates.  There are two

22   differences between the expert dates that the parties proposed.

23   We proposed expert dates that put the generic expert reports

24   due at the same time as case-specific expert reports.  In our

25   experience, there's a very large overlap between the two and we

D8eimirc ag                    CONFERENCE

1    want to avoid having to have separate depositions for generic

2    and case-specific depositions, with the exception of, for

3    example, damages experts, are only case-specific experts.  But

4    the vast majority if not all the other opt-ins have both

5    case-specific and generic opinions.

6            The other difference is that the plaintiffs' expert

7    discovery takes six months which seems much too long.  They

8    have two months just for the depositions of one side's generic

9    experts, which seems very unnecessary, and I believe it could

10   be done in a month, six weeks at the very most.

11           The other difference is in the way that the experts

12   are disclosed.  So they propose that the plaintiff give their

13   generic expert reports and then Bayer gives their generic

14   expert reports and then the plaintiffs' experts are deposed and

15   then Bayer's experts are deposed.  But what we always find that

16   the plaintiffs' experts come up with additional opinions that

17   they give in their depositions.  So for us to be able to

18   respond to them, what we proposed was for the plaintiffs'

19   experts to be deposed, generic and case-specific, and then

20   Bayer's generic and case-specific reports would be due.

21           THE COURT:  You think it should go plaintiffs' experts

22   reports, plaintiffs' expert depositions, and you're not

23   distinguishing between generic and case-specific.

24           MS COOK:  Correct.

25           THE COURT:  And then your expert reports and your

D8eimirc ag                    CONFERENCE

1    expert depositions.  And what's wrong with that, Mr. Ronca?

2            MR. RONCA:  I'll start with that one instead of

3    starting from where Shayna started.  And I'll speak from

4    experience.  In every litigation that I have been in, mass tort

5    litigation like this, in every MDL, and this is the third where

6    I've been co-lead counsel, we've always agreed to do it

7    disclosure plaintiff, disclosure defendant, deposition

8    plaintiff, deposition defendant.  The argument that they come

9    up with different theories or opinions in their deposition is

10   answered by the defendants getting to go second in every case.

11   Their experts can come up with responses to that in their

12   depositions.  The only fair way to do it, to have our experts

13   deposed, asked any question that the other side wants before we

14   even know what their experts are going to say, is just unfair.

15   Let us disclose first, they can respond to that, and then they

16   can take our expert depositions when our experts have had a

17   brief time to see what their defense experts are saying.

18           THE COURT:  What about the issue of having the same

19   cutoff for generic and case-specific?

20           MR. RONCA:  We worked the case-specific not so much

21   with respect to the general but with respect to the fact that

22   we're picking them on April 4th and we allowed about six months

23   to complete all the case-specific discovery.  That sounds easy,

24   your Honor.  But let's say twelve cases are picked like there

25   is in Nexgen and there is an inserting doctor, there's a

1    removing doctor, there might have been a doctor who checked at

2    the four to six-week for the location of the Mirena, you might

3    need three doctor depositions, plaintiff, maybe a spouse,

4    that's two, sales reps, maybe one or two, you need seven

5    depositions in twelve cases.  You need 84 depositions in six

6    months while we're doing general discovery, while we're doing

7    other motions and things that occur in this case, while some of

8    us at that point in time while probably be in Europe taking

9    depositions of some of these foreign defendants.  I assure you

10   it is a pile of work to do in six months.  You're talking about

11   something on the order of, my math is not working for me, 12 or

12   15 depositions a month just for the case-specific, if we go

13   with the plaintiffs' plan, which I think is, six months, very

14   ambitious.

15           THE COURT:  Aren't most cases -- well, I guess it's

16   possible that there will be some cases where you do have

17   several different doctors.  But in most cases, isn't the doctor

18   who prescribed it and inserted it and did the follow-up and

19   removed it the same person?

20           MR. RONCA:  A lot of these are done in clinics, in

21   practices where there are multiple doctors.  You see who you

22   see that time when you go.  This is not considered the kind of

23   thing where -- I mean even for, I just had another grandchild.

24   Even for delivering a baby it's whoever is on call that day

25   ends up delivering the baby.

D8eimirc ag                    CONFERENCE

1          THE COURT:  Except that the delivery of a baby can't

2     be planned.

3          MR. RONCA:  This is a C-section, your Honor.  It's

4     whoever was on call that week.  I'm telling you, we'll be back

5     here, we're talking about 30 days difference, we'll be back

6     here asking for additional time because we will not be able to

7     get these depositions done in that time frame.

8          MS COOK:  Your Honor, the April 4th deadline is for

9     the selection of the initial disposition pool cases.  We don't

10    anticipate that we will have done no discovery in those cases

11    before then.  In fact, in order for each side to fairly select

12    the cases they want in the initial disposition pool, we will

13    have had to have some discovery beforehand so we're in the same

14    position that the plaintiffs are in knowing their cases and

15    having spoken to their clients and everything else.  So what we

16    will plan to do before the April 4th deadline is take the

17    depositions that are necessary to know whether we think that

18    it's a fair case to select for the initial disposition pool.

19    So we're not trying to cram, even assuming that that number of

20    depositions is appropriate for each case, which I think is a

21    different question and not one that I necessarily agree with,

22    we won't be cramming that in between April 4th and September

23    1st.  We will have done a lot of that work beforehand.

24         THE COURT:  I take it you don't have to wait until

25    April 4th to identify your generic experts.  The selection of

D8eimirc ag                    CONFERENCE

1    the initial disposition pool cases isn't something that has to

2    occur before generic experts discovery can begin, right?

3         MR. RONCA:  Generic expert discovery at least on our

4    schedule, your Honor, doesn't occur until after the documents

5    and the generic discovery ends.

6         THE COURT:  You can be working on that.  In other

7    words, the initial disposition pool selection is April of 2014.

8    And the schedule that you're proposing has six months before

9    you even make your disclosures of your generic experts and then

10   two to three months after that for the depositions.  And I

11   guess I'm, my question is, I get that if we're going to have

12   case-specific and generic experts in tandem, because you

13   probably aren't going to commit -- if you're not going to

14   commit on which cases until April, then you need time for the

15   case-specific experts.  But the generic experts it seems to me

16   could be accelerated.

17        MR. RONCA:  But the generic experts in the orderly

18   processing of your case need to know what the documents say and

19   the deposition results are before they can give their opinions.

20   In the orderly processing of the case, we can look at

21   documents, take depositions, turn those things over over time

22   to the experts who then need to review all those things and

23   then disclose the experts and then, and have the expert

24   reports.

25        THE COURT:  All right, I hear what you're saying.

1    They might not have everything they need until September 1.

2            MR. RONCA:  We won't have everything we need until

3    September.

4            THE COURT:  What do you think about the defendant's

5    proposal that case-specific and generic expert disclosure be

6    made at the same time?

7            MR. RONCA:  One is often dependent on the other.  Step

8    into our chair for a second.  What we would have to do then is

9    have the generic expert reports prepared and given in time to

10   the case-specific experts so they can look at those things

11   and -- they're interdependent.  The generic expert reports on

12   the science say yes, this can happen scientifically,

13   physiological.  There is a mechanism in action for the Mirena

14   for perforate and migrate.  We see this over this many

15   examples.  We know this from the anatomy and physiology of the

16   body and from experience and case reports, for example.  That

17   is all gathered together by the generic experts report.  The

18   case-specific expert says:  This individual plaintiff has this

19   individual migration and perforation which falls into the same

20   pattern that the generic experts are talking about when they're

21   talking about a defect in the product or a failure to warn

22   about the product.

23           THE COURT:  Ms Cook seems to think, and correct me if

24   I'm wrong, that a lot of times these experts are going to be

25   the same person.

1          MS COOK:  Right, your Honor, that's what we saw in,

2     for example, most recently in the YAZ cases.

3          MR. RONCA:  That was not true in Trasylol which is the

4     same company.  There there were case-specific experts who were

5     distinct and different from the generic experts.

6          So again, you can talk about experiences, but what

7     will end up happening, your Honor, because this is not a loose

8     schedule where there is a lot of extra time.  We'll come back

9     and say you, see, the experts are different.  Even though we

10    can show you the transcript from when we talked about this in

11    August of 2013 that they might be the same, the fact is that

12    they are different and they're not the same person.

13         THE COURT:  What can we do to accommodate your

14    concern, which is legitimate, that the case-specific experts

15    are going to want to see the reports of the generic experts

16    while at the same time avoiding what Ms Cook is concerned

17    about, which is having to do two depositions of the same person

18    because there may be some cases where it is the same person.

19    Could we at least, if I adopt something like your schedule,

20    build in an exception for a situation where a generic expert is

21    also going to be a case-specific expert so that that person

22    only has to be deposed once?  You should be able to tell by the

23    time they do an expert report whether or not you're going to

24    use the same guy or gal for a case-specific report.

25         MR. RONCA:  I think we could set a point in time that

1    if it is going to be the same expert, we'll have status

2    conferences on a regular basis, we'll report that to the Court,

3    and they can schedule them at the same time.  They're probably

4    going to depose on the general things and then on the specific

5    things separately, but you can certainly do it at one time if

6    that turns out to happen.

7         THE COURT:  Why don't I build in -- let's assume I'm

8    going with something like your schedule but I'm going to

9    require that the plaintiffs state by the time the expert report

10   is disclosed whether that expert is going to be providing any

11   case-specific reports, and if so, the defendants don't have to

12   depose that person until after the second report is disclosed.

13        MR. RONCA:  I think that's fine.  I didn't get to

14   discuss it with anyone, but I'm the one standing here.

15        THE COURT:  And I'm the one sitting here.

16        MR. RONCA:  You're the one making the rules.  So I'm

17   pretty much boxed in here, your Honor.

18        THE COURT:  If there's a reason why that's a bad idea,

19   I want to hear about it.  But it sounds like a good idea to me.

20        MR. RONCA:  Yes, one deposition.  What you're talking

21   about, Judge, is not having two depositions of that person but

22   having one deposition of that person.

23        THE COURT:  All I'm putting on you guys is --

24        MR. RONCA:  Tell us, disclosure.

25        THE COURT:  You make your generic expert disclosure on

D8eimirc ag                    CONFERENCE

October 30th and at the time you do that you tell them, this

guy, this is the only report we're getting from him, or we're

going to use this guy for case-specific discovery too.  And if

it's the latter, then the defendants will take one deposition

of him after they get the second report.

          MR. RONCA:  Yes.  My understanding is on the day of

the generic expert disclosure we have to also say whether that

expert is also going to be a case-specific expert and then the

defendants will get one deposition after the second report and

they can use it to cover both things.

          THE COURT:  Does that make sense?

          MS COOK:  The problem I see with that, your Honor, is

under the plaintiffs' schedule, the case-specific disclosure is

not until December 1st and then the case-specific depositions

don't even happen until February.  And in the meantime, Bayer

has to disclose its expert reports without knowing the full

extent of the opinions based on the deposition examination of

the plaintiff's generic experts.  So if we were going to have

two separate sets of disclosures, we would want to have two

separate depositions so we can fairly disclose our expert's

opinion.

          Another problem, even assuming that the generic expert

disclosure, the generic experts for the plaintiff actually are

interested in seeing e-mails from Bayer sales reps or whatever

it is that's being produced a year from now in the September

D8eimirc ag                    CONFERENCE

1    1st deadline, they don't need two months until October 30th to

2    complete those reports.  They should be basically finished.  If

3    there's some late discovery that's relevant of some sort of

4    study, which I cannot even envision, then they could finish

5    their reports by September 15th.

6         MR. RONCA:  Your Honor, all of the foreign discovery,

7    this drug was developed in foreign countries, all the

8    development information we're not going to have until we get

9    the foreign defendants in here and we get that.  And Shayna

10   wants to say that oh, they'll have all this information and it

11   will be just some sales rep depositions by September 1st.  And

12   that's just not so based on my experience in other cases.  A

13   lot of times the key witnesses come down at the end.  A lot of

14   times you find out about the key witnesses at the end.

15        Again, just to go back to another Bayer case in

16   Trasylol, the very key witness was three months after the

17   discovery deadline and the judge realized that it was a key

18   witness and allowed us to take that deposition after the

19   discovery deadline.  And I know because I took it and argued

20   the motion.  So to try to say now anticipatorily, well, it's

21   only going to be small potatoes in August of 2014, that's just

22   not the way it happens.  And to try to have experts cram out a

23   report in 15 days after the generic discovery experts, it only

24   predicts that we will come in here and say you know, your

25   Honor, we got 50,000 pages of documents on August 1st and

D8eimirc ag                    CONFERENCE

1   they're all key stuff.

2          So I think the schedule that we put out was

3   aggressive.  For example, 60 days to depose the experts.  The

4   lawyers have other calls to other courts and have other things

5   to do, and so do the experts.  And what we'll find is that it's

6   going to be difficult to schedule these experts and the lawyers

7   all in the same place at the same time.  And 60 days is

8   aggressive for doing that scheduling.  It's the same thing for

9   the case-specific.  When you talk about scheduling these

10  doctors, in the Nexgen, we're scheduling doctors now for

11  January for bellwether cases.  And Judge Pallmeyer wants an

12  aggressive schedule there.  But these doctors aren't available.

13  You can't make them come.

14          THE COURT:  Yes, doctors are a big pain.  I say that

15  as the wife and daughter of a doctor, so I'm allowed to.

16          MR. RONCA:  They're not a big pain when it's taking

17  care of patients.  But when you try to get them to a

18  deposition, it's a big pain.

19          MS COOK:  It's less of a big pain when you're paying

20  them for their time as experts.  And they have agreed to take

21  their time to be experts in the case.

22          THE COURT:  I'm sure you'll make it worth their while.

23          MS COOK:  May I address the foreign witness issue for

24  one moment.  We have seen only three cases in this MDL that

25  even name a foreign entity.  An entire other case was heading

 1    to trial without ever even naming a foreign entity.  To say

 2    that all of a sudden things should be held up because of an

 3    afterthought of naming foreign companies, and the complaints

 4    that I'm hearing that there is a treaty, an international

 5    treaty that the United States entered into with Germany and

 6    Finland -- you know, we discussed this last time at the

 7    hearing.  The plaintiffs will serve them if they want to as

 8    expeditiously as they can.  If it ends up that they're not able

 9    to serve them in this time, we can deal with the schedule then.

10    As it currently stands, I don't believe that it's appropriate

11    or fair to Bayer to have that hold-up of the schedule.

12         THE COURT:  I'm not going to worry my head about that

13    yet.  If they get served and if they're in the case, it seems

14    to me they will share the defendants' desire to get this moving

15    quickly.  And it may be that they can jump right up to speed.

16    Even if they have other lawyers, somehow I doubt they're going

17    to want to reinvent the wheel when the American entity (a) is

18    itching to go, and (b) will have done such fine work.

19         MR. McCAULEY:  Your Honor, if I may just address one

20    issue that Ms Cook brought up about the number of cases that

21    have been filed with respect to the foreign defendants.  The

22    foreign defendants have become an integral part of this

23    litigation because of foreign regulatory rules when it comes to

24    producing custodial files.  In the Baugh case, there were five

25    specific custodians that were identified by the Bayer U.S.

1    witness as being key people who have a knowledge of the

2    product.  Therefore, they're people we need their documents

3    for.

4          Defense counsel and myself undertook a discussion

5    about how to try to get that without service.  The problem is

6    that neither one of us want to violate international rules in

7    this so-called Hague petition or Hague treaty that's out there,

8    something that's been applicable for quite sometime when it

9    comes to foreign defendants and specifically this defendant.

10   Bayer and Bayer AG are very familiar with what is necessary to

11   bring in their employees from foreign companies.  The past

12   practice of Bayer has always been that the defendant must be

13   served once in each jurisdiction with respect to here and with

14   respect to New Jersey.  As far as naming and trying to send out

15   complaints for, between the two litigations, almost 400 cases,

16   I can tell you from my office having done that that would be a

17   multiplier of about 15,000 dollars per case to have them

18   served.

19         So while we have been doing everything we can to

20   expedite the process in which these witnesses are brought in,

21   and there was an offer from defense counsel of producing the

22   witnesses, somehow they don't represent them, but they were

23   going to produce witnesses without a custodial file.  They were

24   going to go to their client, I shouldn't say that, they did not

25   commit to it.  We were discussing about whether or not they

D8eimirc ag                    CONFERENCE

1    could produce the witness without a custodial file.  That just

2    creates duplicative work because once we do the deposition over

3    in Amsterdam, because we can't do it in Germany, we're probably

4    going to find a document that's in a custodial file that we

5    don't have and go back all over again.

6           The reason why there haven't been service attempts of

7    400 people, relying back on the very first conference in which

8    your Honor brought about trying to coordinate and decrease the

9    potential expenses associated with this, are just that.  We are

10   trying to move it along.  The estimates are from our service,

11   which as a main service it does this type of work for many

12   litigations, is it's going to take it until at least October,

13   which will bring us up to actually have to ask your Honor for

14   an extension of the 120 day time to serve because we're going

15   to be outside that.

16          We you are moving as fast as we can.  These are people

17   specifically identified.  We actually have the hindsight of

18   U.S. witnesses that have identified them.  This is not a shot

19   in the dark or throwing darts at the wall.  These are witnesses

20   that their own people have identified.  So we're trying to move

21   this along as fast as we can.

22          THE COURT:  I'm going to wait and see.  I don't doubt

23   what either side is saying.  I'm going to set a schedule that I

24   think works.  If the foreign entities come into the case, it is

25   my hope that they will share the current defendants' desire to

1    move things along and they'll share their work, etc.  If they

2    don't, we'll have to revisit.  But I want to put in a schedule

3    that I think is realistic for what's in front of me now.  And

4    I'm sure Ms Cook, consistent with her consistently expressed

5    view that they want to move quickly, will do whatever she can

6    to speed things along.  But I gather you don't represent them

7    and all you can do is speak on behalf of your client.

8         MS COOK:  Your Honor, if the entities are actually

9    served and brought into the lawsuit, I will represent them.  I

10   do not have authority to waive the service under the treaties

11   and I also don't have any authority to violate the EU's privacy

12   laws and produce documents from there.

13        THE COURT:  I always like to avoid an international

14   incident if possible.  Once they're served, maybe you'll --

15   look, I don't second guess this.  As a matter of principle, if

16   they want to wait to be served, that's what the law entitles

17   them to do.  But they're going to be represented by very

18   reasonable counsel once they're served and they probably won't

19   insist on doing everything formally once they're in the case.

20        So I think I understand why defendants would like the

21   generic and case-specific disclosure at the same time so they

22   only have to take one deposition.  I understand why the

23   plaintiffs don't want to do it that way because the

24   case-specific experts will build on what the generic experts

25   say.  I thought I had a great idea to solve the problem, but it

D8eimirc ag                    CONFERENCE

1    doesn't solve the problem from the defendants' perspective, so

2    I think I'm just going to fall back to the traditional way of

3    doing it, which is plaintiffs' generic expert reports, then

4    defendants' generic expert reports, and then depositions of the

5    generic experts, and then the same with case-specific.  Let me

6    just look at the dates that plaintiffs have proposed, which is

7    essentially --

8           MR. RONCA:  There's an overlap.  Like while the

9    plaintiffs' generic experts are being deposed, our

10   case-specific disclosures occur.  It's not like we're doing all

11   the case-specific after the fact.

12          THE COURT:  Right.  But you wouldn't be making your

13   case-specific reports available until after both sides have

14   done their generic reports, which makes sense.  I'm just trying

15   to figure out if there's a little room for me to tighten up.

16   Because what you've proposed is the expert depositions wouldn't

17   be completed until May 1.

18          MR. RONCA:  Right.  But I have the plaintiff

19   case-specific experts just two weeks after the defendants'

20   generic disclosures.  It's very tight.

21          MS COOK:  I believe they have a two-month time frame

22   between the end of generic discovery and their generic expert

23   disclosures, but then they give us two weeks for our generic

24   expert disclosures after theirs.  I think the October 30th date

25   should be moved up to September 30th and then we should get a

D8eimirc ag                    CONFERENCE

1   month after they give us their reports.

2           THE COURT:  I guess the reason for that would be if

3   you take a deposition on August 31st, the experts are going to

4   need that.  But we can tweak this a little.  I can shave a

5   couple of weeks here or there; before you know it, I've shaved

6   a month or two.  Why don't we make that October 30th date

7   October 15th.  And then leave defendant's generic -- that

8   doesn't buy me any time, then defendants will be a month later.

9   Right now there are six weeks between the disclosure of the

10  defendant's generic experts and the beginning of the

11  depositions of the plaintiffs' experts which is longer than I

12  would do except it's right after Christmas.

13          MR. RONCA:  No.  It's two weeks.

14          THE COURT:  If the defendants make their reports

15  available November 14th, ordinarily I would say okay, start

16  your depositions four weeks later, but the last two weeks of

17  December are sort of a waste.

18          MS COOK:  As far as I'm concerned, we can start our

19  depositions of the plaintiffs' experts right after we serve our

20  expert reports.

21          MR. RONCA:  They have to read them.

22          THE COURT:  They'll read them quickly.  Why don't we

23  say --

24          MR. RONCA:  We already have it set at two weeks.

25          THE COURT:  Right now their expert reports are coming

D8eimirc ag                    CONFERENCE

1    on November 14th.  They are willing to start deposing your

2    experts on December 1 instead of January 1.

3            MR. RONCA:  That's what we proposed.  That's what we

4    already proposed.

5            THE COURT:  Maybe there's a typo on the sheet I'm

6    looking at.  Oh, yes, it's a typo on the sheet I'm looking at.

7    And do you really think you're going to need -- probably you

8    will need eight weeks.

9            MR. RONCA:  Because of the two dead weeks at the end

10   of December.

11           THE COURT:  All right.  I'm with you.  And do you

12   think you can depose, you're going to need eight weeks to

13   depose Bayer theirs.  Can I tighten the schedule for

14   depositions of defendant's generic experts to end March 15th

15   instead of April 1.

16           MS COOK:  I don't think it should take two months but

17   I've already made that clear.

18           THE COURT:  I'm going to make that March 15th.

19           MS COOK:  Your Honor, I also think since we're

20   staggering the generic and case-specific expert disclosures, I

21   don't see why they need to be staggered by a month and a half.

22   I don't see why the plaintiffs' case-specific disclosures

23   couldn't come on November 1 or November 14.

24           MR. RONCA:  Because we don't have your generic expert

25   reports is the main reason.

1          MS COOK:  I don't see that the plaintiffs'

2    case-specific experts would be responding to or relying on

3    defendant's generic experts.

4          MR. RONCA:  I think we're entitled to know your theory

5    before we go case-specific.

6          THE COURT:  Why don't we move up the depositions of

7    defendants case-specific experts and make it March 1 to April

8    15.  And if any of these dates turn out to be Sundays, we'll

9    tweak them, Saturdays or Sundays.  And then the motion

10   deadline, you can make that May 15th for dispositive motions.

11   Essentially, the schedule I'm going to adopt is that proposed

12   by plaintiffs with the following exceptions.

13          The deadline for plaintiffs' generic expert disclosure

14   is going to be October 15th.  The depositions of the

15   plaintiffs' generic experts -- no, withdrawn.  That's going to

16   stay the same.  The deposition of defendant's generic experts

17   is going to be February 2 to March 15.  And the deposition of

18   defendant's case-specific experts is going to be March 1 to

19   April 15.  And the initial pool, *Daubert*, and summary judgment

20   motions deadline will be May 15.  This seems like a reasonable

21   middle ground but it's something that's achievable.  I think

22   I'll consider myself very fortunate if we stick to that.

23          MS COOK:  Your Honor, may I just raise one point.  You

24   changed the defendants' case-specific experts depositions to be

25   from March 1 to April 15 but the plaintiffs' case-specific

1    experts are February 2 to March 15th so there's an overlap

2    where potentially our experts could be deposed before theirs so

3    I would suggest moving the plaintiff case-specific depositions

4    to start something like January 20 through the end of February.

5          THE COURT:  They won't get your reports until the

6    15th.  I mean yes, there will be an overlap.  But obviously, if

7    you haven't deposed plaintiffs' expert on case A, you're not

8    going, they're not going to depose defendant's expert on case

9    A.  You'll just have to work that out.  But if you've done

10   plaintiffs' expert on case B on February 2nd, there's no reason

11   why you can't do the defendant's expert on case B.  Unless you

12   think it's going to be all the same person.

13         MR. RONCA:  Which we've agreed that we would disclose.

14   And your Honor, I don't think we're going to come in here with

15   a situation where we try to snooker them and take their expert

16   before they take our expert.  That's just not going to happen.

17   You're not going to allow that to happen.  They'll complain to

18   the Court either at a status conference or via letter.

19         THE COURT:  I can put a footnote in the order saying

20   plaintiffs will not depose any defense expert on a case as to

21   which defendants have not yet deposed plaintiffs' expert.  I

22   don't expect any double-crossing.

23         Now, you have some issues and the fact sheets.  The

24   first is plaintiffs want to know about the defendants' sale

25   contacts, etc., with the prescribing doctor, the inserting

1   doctor, the follow-up doctor.  And the defendants' argument is

2   with respect to, and correct me if I'm wrong, that prescribing

3   doctor and inserting doctor, okay, but the follow-up doctor or

4   the removing doctor, what he or she knew or believed or was

5   told isn't relevant because the issue is what warning was given

6   before the thing went in.  Why do you need the sales calls of

7   the doctor who solved the problem at the end?

8           MR. McCAULEY:  Your Honor, in this particular case

9   there will be certain issues where it is a moot point.  So

10  where a gynecologist saw the patient and prescribed the Mirena

11  to be inserted, and that gynecologist continued through with

12  treatment after the insertion for a six-week follow-up, a year

13  later for the annual visit, and if that physician is the

14  diagnosing physician and then -- it's questionable, based on

15  surgical capabilities, whether it will be the removing

16  physician, that will be the same person.

17          THE COURT:  Mr. Ronca told me why it probably won't be

18  in more cases than I thought.

19          MR. McCAULEY:  In some cases.  In other cases where

20  somebody went to say Planned Parenthood and had an insertion

21  done and then followed up with their own OBGYN or went to a

22  different OBGYN clinic, right there we have two different

23  people.  We have the person they saw at Planned Parenthood

24  followed up by a second person that actually did an IUV check.

25  In every one of these cases, your Honor, the annual notes and

1    the follow-up notes all say IUD check confirmed, Mirena in

2    place.  Whether they do it on a sterile speculum examination,

3    whether they do it on a radiological examination, or how they

4    palpate the fact that the strings are there, there's an

5    examination done.  And it's done in different avenues, whether

6    it be in the timing of the first follow-up or the in the annual

7    visits.  In the label and in the discussion between the doctors

8    and Bayer there's directions to them as far as how long the

9    string should be, what to look for, and the information that

10   they need as to whether or not to make a determination that

11   this device is actually still in place one year, two-year,

12   three year, four years, five years.  That's important, your

13   Honor, because in a typical prescription drug, medication case,

14   you could be dealing with eight, nine, ten years of medication.

15   We have a five-year window of efficacy that's claimed by the

16   defendants.  So what we're looking for is the line, we've sort

17   of developed the term ourself, the vertical line, in that

18   five-year period maximum five-year period.  So a woman goes and

19   she has the device implanted, she goes back for a follow-up,

20   she goes for her annual visit, another annual visit, two or

21   three years in.  You're talking about two or three, possibly,

22   different doctors.

23          THE COURT:  I understand why the doctors are

24   important.  I am trying to find out why if you're not the

25   inserting or prescribing doctor your sales contacts with Bayer

1   are important.

2            MR. McCAULEY:  Because that is there, as the testimony

3   always comes in from the sales reps, they give the information

4   to the physician.  They come in with the samples, they come in

5   with the package inserts, labels, and they impart that

6   information to the doctors.  And that's different for Bayer's

7   product and from other products.

8            THE COURT:  What elements of the claim will it relate

9   to?  It can't be the failure to warn because the decision to

10  put the thing in was made by somebody else.  Let's assume Dr. A

11  prescribes the device, puts it in, and does the four to

12  six-week check-up and Dr. B does the annual after that.  What

13  elements of the claims would Bayer's contact with Dr. B relate

14  to?

15           MR. McCAULEY:  The information that it would apply to

16  is the continued conversations between the

17  plaintiff/client/patient of the doctor and the physician.  In

18  the plaintiffs' fact sheet, the defendants demanded all

19  discussions between the plaintiffs and their physicians with

20  respect to the product, the life of the product as inserted.

21           THE COURT:  I get that part.  What about Dr. B's sales

22  calls to Bayer.

23           MR. McCAULEY:  That information and whether or not

24  Dr. B has had discussions about the possibility of perforation

25  being a risk are completely within the relevance of the

D8eimirc ag                    CONFERENCE

1    litigation.

2            THE COURT:  Talk to me about what element of what

3    claim.  Let's say Dr. B had a sales call from somebody at Bayer

4    and they told him something that he then told his patient.

5    What element of what claim does that help you with?

6            MR. McCAULEY:  The discovery of the problem itself.

7    It also comes into what's --

8            THE COURT:  The discovery of the problem, the doctor

9    discovers it.  But what's the relevance of what the sales rep

10   says to the doctor that is going to make a difference to one of

11   the elements of your claim?  You're going to need the doctor to

12   say as a matter of fact I discovered the problem, but what

13   difference does it make whether he met with Bayer one time or a

14   hundred times?

15           MR. McCAULEY:  Whether he's had communications with

16   Bayer about what could be a cause of the perforation and the

17   information that he may have imparted on that sales

18   representative, and that physician's information report or PIR

19   that's generated by that visit with the doctor.  When the sales

20   recommend comes in they ask him about the experience with the

21   product, and if he has any questions of that particular sales

22   rep, and it's a different physician, and that goes back to the

23   company, which is where we ask for and get the physician

24   information reports about the treating physicians.  Because it

25   doesn't have to be with this particular patient.  It could be

1    their knowledge and experience of the product.  And as the

2    knowledge and experience of the product develops across the

3    different physicians, that is something that's relevant.

4          And I would suspect that when that treating physician

5    is deposed, and they will depose that treating physician as

6    part of the bellwether process, they will ask that physician

7    whether or not they had a sales call from a sales rep, a

8    different doctor, and they will go directly into the

9    information about how many sales calls they had, the

10   information they were given about warnings, all information

11   we'll be in the dark about as well, your Honor.

12         THE COURT:  I'll give you one more chance to tell me

13   what elements of what claims.  When you're standing before the

14   jury, you're going to say:  The doctor who removed this device

15   had been contacted by Bayer sales reps six times and therefore

16   ladies and gentlemen ...

17         MR. McCAULEY:  There's a continuation of failure to

18   warn here as well, your Honor.  The product can be removed at

19   any particular time.  Just as when somebody goes on a

20   medication, if they are put on an medication by a specific

21   OBGYN and he retires and they go back a year later and that

22   prescription is filled by the new OBGYN, it's a continued

23   discussion, it's a continued failure to warn issue there.  If

24   they're having some sort of complaint and they go back to the

25   doctor, that second doctor is actually going to talk to them

1    about the risks and benefits of the product they have inside of

2    them at that particular time and an informed decision by the

3    plaintiff is going to be made as to whether or not the device

4    should remain inside and whether or not they should maybe seek

5    a different one.

6            There are plenty of cases where the Mirenas are

7    removed before the five-year efficacy, the voluntary removal.

8    The discussions and the reasons why it was removed, and the

9    information that the physician has in their armamentarium with

10   the discussions is very relevant.  And that's where the

11   continuation -- this is not --

12           THE COURT:  You think it will help you prove that

13   Bayer failed to warn by proving that after a discussion with

14   the sales rep the doctor didn't warn the patient to take it

15   out?

16           MR. McCAULEY:  It goes to the knowledge of the

17   physician that's following up with the patient.  The knowledge

18   of how long the string should be.  One of the issues in this

19   case will absolutely be whether or not there's an alternative

20   causation raised of medical malpractice.  Whether or not the

21   physician knew how long the strings were when they went for a

22   follow-up visit, if that changed, how does that physician know

23   and the information that they get amongst themselves.

24           We had offered, your Honor, on the specific, on the

25   defense fact sheets, the initial negotiations, the defendants

1    have always said we will only give you just the prescriber

2    inserter.  We say okay, we'll come off of this whole line of

3    doctors that we want and say can we have the prescriber

4    inserter plus one.  We'll be able to look at the records we

5    have and we'll see who that person is and we'll see if we can

6    identify that particular person as being a key witness.  That

7    will be the plus one.  We're not looking for general

8    practitioners or people who are not related to the care.  We're

9    looking for physicians, very small finite group of physicians

10   who actually treated the patient after it was inserted.

11         There's also a continuing course of marketing efforts

12   as to safety and the possibility of spontaneous perforation.

13   There are discussions that go on and it's information, that we

14   see every time in every single sales rep deposition, that is

15   imparted upon the doctors when they go in for these visits.

16         THE COURT:  Ms Cook, why isn't it relevant that your

17   reps may have lulled follow-up doctors into thinking everything

18   was copasetic when it wasn't?

19         MS COOK:  Your Honor, the purpose of the defendant's

20   fact sheet in any MDL is to provide information about Bayer's

21   communications with the prescribing physician which is the only

22   physician that the duty to warn runs to.

23         THE COURT:  Isn't there, because the product requires

24   annual, I'll call them check-ups, isn't there a duty to warn

25   that doctor too?

1          MS COOK:  I'm not aware of any law that has a duty to

2     warn doctors who do not prescribe the medication.  And the

3     example that Mr. McCauley gave about other cases where you have

4     doctors who are refilling medications is a totally different

5     situation because those doctors are actually making a risk

6     benefit analysis about whether the drug is appropriate for the

7     patient.  That is a prescribing decision and that is the

8     situation where the company would have a duty to warn.  Bayer's

9     contact with the doctors or sometimes nurses who are doing

10    these threads checks who are not making a prescribing

11    decision -- they're not performing an independent risk benefit

12    analysis every time they check to see if the threads are in

13    place -- are not relevant to a duty to warn.

14         THE COURT:  You're probably right as a practical

15    matter in most cases.  But aren't there some cases where

16    somebody goes in for a thread check and the doctor would say,

17    you know what, I don't like this device, I think it's

18    dangerous, I think you should take it out.

19         MS COOK:  That might be a situation that may happen.

20    If there gets to be some crazy hypothetical situation like that

21    in an individual case then the plaintiffs can ask for the

22    records pertaining to that individual doctor.  But the

23    defendants fact sheet puts the burden on Bayer to give a whole

24    range of information about every single case.  And this burden

25    is very high.  Bayer has to go to nine, at least nine different

1    sources of data, databases, multiple departments within Bayer

2    to get information about sales calls, the samples left, any

3    adverse events that are reported, the person was ever paid for

4    any consulting agreement, whether the person ever attended any

5    conferences, try to get their prescribing data.  All of this

6    information is a huge burden to get and as a compromise in this

7    case, because in every MDL there is a defendants fact sheet for

8    one person, that's the doctor who prescribed the medication,

9    and that's it.  And in this case, because it's possible that a

10   nurse midwife or something may have recommended the Mirena to a

11   patient and said that it was the appropriate birth control for

12   that patient, and then there may have been another doctor who

13   actually did the insertion because the nurse midwife was not

14   permitted to do so under law, we have offered that we would

15   give all of this information about both of those people.

16   Because technically speaking, both of them may have done a risk

17   benefit analysis about the Mirena.

18         But the person who is physically doing a check, a

19   check that, as Mr. McCauley said, is clearly laid out in the

20   label four weeks later or a year later or years later is not

21   relevant to the duty to warn or any other claim in each of

22   these hundreds of cases.

23         MR. McCAULEY:  Your Honor, if I may.  With respect to

24   Ms Cook's claim that it's different between a PO or pill-based

25   product and this particular product and the risk benefit

1    analysis, I submit to the Court that it's not.  Because when a

2    patient comes back to the doctor for their annual visit after

3    taking Bayer's product, a determination is made at that

4    particular time whether or not this particular product is

5    delivering a particular hormone the patient is appropriate to

6    continue on, whether or not there are any untoward effects or

7    anything that may want the patient to discontinue the product.

8    If the patient continues on, and if it's a different physician

9    that had that, that information was turned over, that

10   information was provided.

11        With respect to Mirena, Mirena is levonorgestrel, a

12   different type of hormone.  When the patient goes back to their

13   doctor and they have the same type of a discussion about

14   whether this particular birth control method is appropriate for

15   them and whether or not they should continue on, and it may be

16   something as simple as how is it going, a discussion is had and

17   if it's a different physician there's still the drug in the

18   body, levonorgestrel is still in the body at that particular

19   time.  It's the same kind of medication as an oral

20   contraceptive, it's doing the same thing.  And a decision is

21   made at that particular time whether to continue on the

22   medication and whether that's appropriate.

23        That's where the issue comes in as far as the

24   continued knowledge of it.  As Ms Cook says, in those

25   particular cases it was a continued prescription.  Here we have

1    one prescription except that prescription renews itself every

2    year for five years while it still remains in the person's

3    body.  So while there may have only been one medication

4    prescription written at a particular time for this particular

5    medication, the medication vessel or vehicle, it's continued,

6    because it can be be voluntarily removed most times in the same

7    office visits.  It's the same continuum as staying on a PO

8    medication, your Honor.

9              THE COURT:  All right.  I think it's important to

10   remember that we're dealing with a fact sheet here.  I'm not

11   saying that this is not discoverable information, but I do

12   not -- I agree with the defendants that it would be burdensome

13   to require it in a fact sheet.  However, if facts are developed

14   along the lines of what plaintiff suggests, either through

15   depositions or something the plaintiff says in the plaintiff's

16   fact sheet, or if the issue of malpractice in failing to remove

17   it rears its head in any fashion, then the plaintiffs can make

18   a request in a specific case.  But I think given the likelihood

19   that in most cases there will have been no particular

20   discussion at the follow-up visit, no particular

21   decision-making by the provider at the follow-up visit, it

22   would be burdensome to require it in the fact sheet.  But if

23   there is any hint that there were risk benefit discussions at

24   any follow-up visits, then the plaintiffs can make requests

25   specifically with respect to a given patient.

1          MR. McCAULEY:  Stepping outside of the fact sheet for

2     a moment, we'd like the opportunity to renew this issue when it

3     comes to the trial court, because we'll be down to a much

4     smaller group of cases, ten or fifteen cases, and we'll be

5     dealing with cases specifically where the defendants will be

6     going out and taking all of these doctors' depositions.

7          THE COURT:  Well, that might be so.

8          Issue number two, the plaintiffs want to know the

9     number of nonMirena sales calls made by women's health sales

10    reps from the introduction of Mirena to now, I guess.  And

11    defendants think that's not relevant, and they will give annual

12    sales calls on all products by every representative within the

13    three years prior to insertion.  Why, Mr. McCauley, do

14    nonMirena sales calls from the beginning of time, or from the

15    introduction of Mirena, which was when?

16         MR. McCAULEY:  2000.

17         THE COURT:  From 2000 to 2013, why is that -- I

18    understand you're getting a hundred percent of the Mirena

19    information, but why is information about some other product

20    relevant?

21         MR. McCAULEY:  This was dovetailed into the discussion

22    we just had.  We're not specifically looking for the

23    identification of the product or the sales information that

24    goes along with that product.  However, the information that we

25    were looking for has to do with the number of times Bayer's

D8eimirc ag                    CONFERENCE

1    sales rep came into the new prescriber inserter's office and

2    the dates which they came into the office.  And that's

3    important because many times the women's health care sales reps

4    detail more than one product.  In this case it could be Mirena,

5    Beyaz, YAZ, Ocella, and they would have been in the office on

6    Tuesday detailing one particular product and then back on

7    Wednesday detailing two products.

8           It's not the product information, it's the number of

9    times the people came into the office and the dates in which

10   they came into the office that is relevant.  It's an

11   opportunity for the physician to be speaking to the same sales

12   rep.  Sometimes there are different sales reps, but at the same

13   time they're Bayer witnesses and employees, that come into the

14   office and typically say to the doctor, if it's a YAZ or

15   another product discussion, and limited to that, okay, and at

16   the end of the call it will be something like do you have any

17   other questions about anything else.  It's an opportunity for

18   them to either give the information to them or ask a question

19   about another Bayer product.  This is limited to just the

20   dates --

21          THE COURT:  How does it really help you if it's just

22   limited to the dates?

23          MR. McCAULEY:  It tells us they were in the office

24   five times that week rather than when the defendants turn over

25   the sales notes and it shows just that they were there just one

D8eimirc ag                    CONFERENCE

1    time that week.

2            THE COURT:  And from that you're going to argue:

3    Ladies and gentlemen, this doctor was in the pocket of the

4    Bayer company, who was getting pizzas from the guy every day.

5    I mean, what argument are you going to make?

6            MR. McCAULEY:  It plays into the exposure that the

7    physician has to Bayer and the opportunities that are there for

8    them to either discuss particular information with them or ask

9    questions.

10           THE COURT:  And Ms Cook, this sounds less burdensome.

11   It looks like you would just have to go to your sales reps for

12   their visit information.

13           MS COOK:  Your Honor, so what we're talking about is

14   not dates of calls at all but what -- let me just start by

15   saying I actually don't think that Bayer's position is that

16   this information about other sales calls on other drugs doesn't

17   have any relevance to the lawsuit at all.  As a compromise, we

18   offered to provide the annual number of nonMirena sales calls

19   on the prescribing or inserting physician.  The only question

20   is what time period.  We offered the three years prior to the

21   plaintiffs' insertion because while it's not as massive as a

22   burden it's still a burden to count up all the calls for every

23   year.  The plaintiffs want the information from the beginning

24   of Mirena, the first time there was a Mirena sales call on a

25   physician, which as you know could be back in 2000 or 2001,

D8eimirc ag                    CONFERENCE

1    through the present.

2              THE COURT:  They also want the specific dates, not the

3    total number.

4              MS COOK:  That's new this morning because our

5    agreement is that we would have the annual number of sales

6    calls and the only question is what time period.  And the other

7    reason this request for all calls through the first Mirena, all

8    annual calls through the first call of Mirena to the present is

9    an overreach is because the plaintiffs have agreed with all of

10   the other information they're getting that they will only get

11   them through the date of the removal of the Mirena.  So our

12   position is that it should be three years prior to the

13   insertion, and it certainly shouldn't be up to the present.

14             THE COURT:  What's the significance of calls that may

15   have occurred -- if the thing was removed in '08, why do you

16   need the calls from '08 to now?

17             MR. McCAULEY:  Your Honor, that particular area and

18   that language is definitely left over from prior iterations of

19   the document which included asking for the dates.  So in

20   comporting with what has been agreed upon as far as up to the

21   removal date, we would be looking at it for up to the removal

22   date.

23             THE COURT:  I think this is of some marginal relevance

24   but it's some burden too.  So I think the three years prior to

25   insertion is a reasonable compromise.  They'll be able to

D8eimirc ag                    CONFERENCE

1    argue, Bayer was in this doctor's office four times a week for

2    the three years before she's prescribed this thing and how many

3    times they were there, four or five or six years previously,

4    just seems very remote in time.  So I think the defendants'

5    proposal is a fair compromise.

6            And the last dispute I guess is over the sort of

7    catchall request which plaintiffs argue isn't burdensome

8    because it's been in the fact sheets for YAZ and other

9    products.  And defendant's view is that the searches, the

10   requests that have already been agreed to are going to turn up

11   everything that there is to find and it's duplicative.

12           I guess my first question is does anybody know what

13   the experience has been in the YAZ or in the other MDLs?  Do

14   you ever find anything that hadn't already come up?

15           MS COOK:  Your Honor, it's true that this language,

16   this sort of generic catchall language has been in other CMOs

17   including in the YAZ case.  But that does not mean that the

18   companies actually ran searches for the plaintiffs' name

19   throughout the entire company files.  In the YAZ case, they

20   looked in the places where, if the plaintiffs' name were going

21   to be anywhere in the company it would be in these places,

22   which is in the database that includes customer inquiries or

23   complaints and in the adverse event report database which would

24   include if there were any reports submitted in an adverse event

25   that the plaintiff suffered while taking the medication.

D8eimirc ag                    CONFERENCE

1              And in the defendants fact sheet, sort of before the

2      document request, Bayer has already agreed to produce these

3      documents, communications with the plaintiff or her physicians,

4      which are the customer complaints database, and then a copy of

5      any adverse event reporting form that was produced concerning

6      the plaintiff.  And from our conversations with the plaintiff,

7      they don't actually expect us to search everywhere in the

8      company.  But even though this language was written in other

9      CMOs, I would like it to accurately reflect what we're actually

10     planning to do just so it doesn't appear that there's some

11     additional burden on us.

12             THE COURT:  What is it, Mr. McCauley, that you're

13     really looking for if you're not asking -- I'm glad to hear

14     you're not asking them to search the whole company because that

15     would not be reasonable.

16             MR. McCAULEY:  My example to them was we were not

17     asking them to go to the CMO's desk to look for an index with

18     our client's name on it.  And I can point directly to even in

19     the declaration of this and other Bayer cases it talks about

20     due diligence and reasonable inquiry.  And the limitations of

21     the language say any nonprivileged document which relates to or

22     refers to the plaintiff other than documents received or

23     produced in discovery in this matter and subject to the

24     limitations and exceptions described in this DFS.  We have

25     reasonableness, we have due diligence, and we have a relation

1    back to the actual DFS.

2            One thing I pointed out in the discussions with

3    Ms Cook was when they ran off the litany of places they would

4    actually look for I said that's fine.  They're not actually

5    articulated by name in the fact sheet.  The customer service

6    database is not articulated by name in the fact sheet.  Other

7    information could come from the physicians.  This is all a

8    reasonable inquiry.  And that's why in countless fact sheets,

9    whether it's the two YAZ fact sheets for the same defendant,

10   whether it's the Fasinex fact sheet, whether it's the Actos

11   fact sheets, they all rely on due diligence and reasonableness.

12   While it's a catchall, it has parameters behind it.  And

13   there's never been a position where we said you need to turn

14   over every single paper, look at every single bulletin board in

15   the lunch room see if the client's name is on it.  It's the

16   reasonableness and due diligence as the fact sheet points out.

17           THE COURT:  If you're content with what Ms Cook says

18   they're willing to do, why don't we put that in.

19           MR. McCAULEY:  That puts us in a position where they

20   now need to name the databases they were looking at.  To be

21   honest, we were mystified by the pure objection, because they

22   coopted the entire document section from the YAZ fact sheet

23   changed it to Mirena and then cut out number one.  It's all

24   about reasonableness, your Honor and it's a reasonable inquiry.

25   What she's actually saying and suggesting they have to identify

1    where they're going to search.  And that's not what the fact

2    sheet says.

3         THE COURT:  Do you want to keep secret where you're

4    going to search?

5         MS COOK:  No.  Without naming the databases, I just

6    said it in open court.  I'd be happy to put in the names of the

7    databases that we will search for.

8         THE COURT:  So if you're okay with all those

9    databases, then instead of saying any other document not named

10   above, how about any other document relating to the plaintiff

11   or the relevant doctors found in the following databases.

12        MR. McCAULEY:  It brings back, your Honor, what is

13   going to be a reasonable inquiry.  With respect to the DFS that

14   relates to individual plaintiffs, we'd be talking about

15   identifying all sales reps' custodial files, all sales reps

16   e-mails, regional managers' e-mails.  The list of people is not

17   just a short inquiry as far as a reasonability inquiry would

18   go.  It goes across an entire span of people that on its face

19   seems like it's six or seven people but in reality it could

20   reasonably be within the grasp of 60 or 70 people.  And that's

21   where the reasonable inquiry comes in.  It's not a nefarious

22   request and a search for every document and every page of

23   Bayer.  It just points them and keeps them responsible for

24   looking for it reasonably.

25        MS COOK:  I disagree that that would be a reasonable

1    inquiry.  There is no reason to believe that the individual

2    plaintiff's name would be in some Bayer custodian's file

3    somewhere.  And that's exactly why we have a problem with the

4    broad request.  The two places that we could think of that we

5    could have a plaintiff's name are the ones that we agreed to

6    search for, and it's just not reasonable to run these searches

7    for every single plaintiff in a whole bunch of custodial files

8    where they're not likely to be mentioned.

9              THE COURT:  I think in light of the very specific

10   things that precede this last catchall which is enough in

11   itself, I think, to make it extremely unlikely that relevant

12   stuff would be missed, some sort of -- I don't really see the

13   point of having a requirement that says or anyplace else --

14   well, hold on.  Let me look at the exact language.  I don't

15   want to summarize.  Any document which represents or refers to

16   plaintiff that hasn't already been produced and subject to the

17   limitations and exceptions in the DFS.  When what we're really

18   talking about is any nonprivileged document relating to the

19   plaintiff that's going to be in one of these two places.  Let's

20   just say what we're really talking about.  And again, if it

21   turns out that there's some reason to believe, if a plaintiff

22   says I actually wrote a letter to the CEO, then you go back and

23   look for it.  Because you'll know where to look.  Or a

24   particular plaintiff says we have reason to believe it's going

25   to be somewhere else, and if after you do your 30(b)(6)

D8eimirc ag                    CONFERENCE

1    depositions you conclude that the customer complaint and

2    adverse incident report databases are not the only places where

3    individual plaintiff's names might be named, come back and talk

4    to me.  I'll all ears.

5             MR. McCAULEY:  If the treating physician advises the

6    sales rep that they had a perforation and they provide the

7    patient's name to the sales rep, that goes to the sales rep who

8    has a duty to report it to Bayer.  I can't tell if that name is

9    going to continue on or not continue on to particular people

10   either in sales and marketing or just straight through to when

11   they do the adverse events and possibly PIR.  And these are all

12   documents that I would expect, quite frankly, would be turned

13   over within the scope of the DFS anyway.  The DFS doesn't say

14   in it that they're going to look for the document in a

15   reasonable area.

16            That particular area, when it comes to direct

17   references to our clients and the physicians that are treating

18   them, are within the relevant scope.  Outside of that, that

19   document will find its way through to the medwatch department

20   or the adverse events department, and there may be a discussion

21   internally about it in the sales department.  I don't know.

22            But the reasonable inquiry that's there, we would

23   expect to have the materials turned over to us.  And this was

24   more of if they start naming every single database or if they

25   miss one or it was somewhere else, then the argument will be

1    that's not reasonable or that's not part of the database.  But

2    I understand your Honor's position.

3         MS COOK:  If you have the fact sheet in front of you

4    it actually covers what Mr. McCauley was just mentioning.  We

5    agreed to produce it.  "Please produce a copy of any medwatch

6    form and any other adverse event reporting document, form,

7    line-item listing or other such information whether internal or

8    not that refers or relates to plaintiff including back-up

9    documentation concerning plaintiff and any evaluation or

10   investigation you did concerning the plaintiff."  And that's

11   already, it's under the plaintiff's medical condition as well

12   as please produce any nonprivileged documents that reflect any

13   communication between plaintiff and physician or anyone on

14   behalf of plaintiff other than counsel for plaintiff and you

15   concerning plaintiff.  So these situations that he just

16   mentioned would already be covered and we've agreed to produce

17   those.

18        THE COURT:  I don't see the need for that catchall

19   request.  But again, we're just talking about the fact sheet,

20   and in any individual case, if it turns out there's reason to

21   believe that it's not covered, you'll go back to the defendants

22   and to me if necessary, and also if after your 30(b)(6)

23   depositions you realize that there are other places that

24   reasonably should be looked at, we can always revisit.

25        Are there other things that you think are ripe either

1    for me or for Judge Smith at this point?  I think she's the

2    queen of electronic discovery and she understands predictive

3    coding and things like that.  But I don't know if you guys are

4    ready to talk about those things yet.

5            MR. McCAULEY:  Your Honor, if the opportunity is

6    available, we would like the opportunity to speak to Magistrate

7    Smith about specific issues on how the documents will be

8    processed.  We have been working to complete the production

9    protocol which, as Ms Cook said before, the production protocol

10   will cover how we receive the materials.  It's the middle area

11   about how they're processed, with straight keywords, or whether

12   they're done with advanced analytics or predictive coding.

13           The defendants have taken the position that they're

14   going to produce in a way that's acceptable for the Federal

15   Rules.  And we've had a position that we think that advanced

16   analytics would be a better process.  That discussion has

17   continued on; the defendants have held their ground that they

18   don't wish to work their way.

19           THE COURT:  I'm definitely punting to Judge Smith on

20   that and I'm going to punt you to her on the issue of costs and

21   what's proportional depending on whether there's going to be 14

22   custodians or 22 or whether the remaining 8 you should split

23   the cost of.  And as I said, if anybody is going to be around,

24   you can check with her chambers now, but she may have a few

25   minutes later this afternoon.  I don't think it has to be the

D8eimirc ag                    CONFERENCE

1    whole day but maybe if somebody from each side can pop in and

2    talk to her about how she wants to tee it up, wants you to come

3    back, letters.  And if you think it's premature to talk to her,

4    that's okay too.

5         MR. McCAULEY:  I think we'd like to have an

6    opportunity to speak with each other.

7         MS COOK:  Right.  The parties have more negotiating to

8    do on the protocol.  We're close, I believe, and we've agreed

9    to submit it by next Friday.  And if there are any remaining

10   issues we'll submit that by next Friday.  And if we have, we

11   have also agreed that if we need to set up a hearing with

12   Magistrate Judge Smith that we will jointly find a time that

13   works for both of us and go to her to set that up.

14        With respect to the predictive coding issue, I don't

15   believe that that will be an issue that either Judge Smith or

16   yourself has to deal with because my understanding from

17   plaintiffs' counsel is that given that they agree and do not

18   contest that the method of keyword searching that Bayer is

19   using complies with the rules, that they are not going to

20   compel us to use another method over objection.  So the issues

21   we're really talking about are what kind of document extensions

22   and what do you do with duplicates and things like that.

23   They're not really heady issues at all and I believe we should

24   be able to come to agreement on those.

25        THE COURT:  Good.

D8eimirc ag                        CONFERENCE

1          MR. McCAULEY:  We may have a disagreement on positions

2     but I believe it's better for Judge Smith.

3          THE COURT:  You can keep talking.  Don't talk too long

4     though because you want to get going.

5          MS COOK:  I agree, your Honor, which is why I would

6     request that if you could impose the deadline of next Friday on

7     us in addition to our agreement to get finished with our

8     negotiations by next Friday, then that would actually help a

9     lot.

10          THE COURT:  I impose that.  I will tell you though

11     that next Friday is the 23rd.  I don't think you'll be able to

12     reach me or Judge Smith the next week.  That doesn't mean we

13     won't be eagerly reading all our mail, but we're both not in

14     the building that last week of August.  But anything that you

15     need to tee up for her, do it by the 23rd.

16          Anything else today?

17          MR. THOMPSON:  Your Honor, I was taught at an early

18     age that when you're sitting comfortably in court and nothing

19     bad is happening, don't stand up.  But I'm going to rise anyway

20     in violation of everything that I've been taught.

21          There are three things that I'd just like to mention

22     to you.  Number one, it's clear from your honor's questions to

23     Mr. McCauley with regard to duty and with regard to the process

24     of device being inserted in women that you're a long way along

25     your thinking in terms of obligations and duties.

D8eimirc ag                    CONFERENCE

1          THE COURT:  Hardly.  Hardly.

2          MR. THOMPSON:  I want to make sure that the Court

3    hears articulated from us that we disagree that the subsequent

4    examining physicians, that there's no duty to impose upon those

5    physicians with regard to a duty to warn.  We disagree with

6    that.  We certainly are pleased with the defendants fact sheet,

7    I don't mean to reopen that issue, we heard your ruling and

8    abide by it.  But we don't want to leave you with the

9    impression that we don't believe that these subsequent

10   examination physicians are people within the penumbra of an

11   obligation to be informed and to inform their patients as well,

12   particularly with regard to reasonable alternatives.

13          Secondly, there is a delicious aspect to this case,

14   and that is that in fact Bayer has put on the market as of this

15   past year a competing IUD device which is smaller, it's

16   inserted for a shorter period of time, and has less hormone

17   released in the body.  So our obligation with regard to showing

18   a reasonable alternative, we think that that's going to be a

19   very fertile and very important area of inquiry.

20          THE COURT:  No pun intended.

21          MR. THOMPSON:  Your Honor, I just throw them out and

22   sometimes they are embarrassing to everybody.  So I just wanted

23   to make that statement with regard to our view of duties and

24   obligations of downstream physicians.

25          Secondly, your Honor, I do want to report back, I

1   think last status hearing I tried to report on the St. Louis

2   forum, and I think I misspoke on every single major thing, the

3   number of cases, the status of cases.

4        I can report that that *forum non conveniens* motion

5   that was pending has been decided in favor of those cases, has

6   been decided in favor of those cases proceeding in front of

7   that forum in St. Louis.  And that will be a continuing node of

8   state court activity.  I believe at a reasonable time, a

9   liaison with that court and the New Jersey court will be

10  advantageous to this Court as well.

11       I think I'm required to ask for permission to argue

12  against settled precedent here because you have ruled very

13  clearly with regard to direct filing of complaints in this

14  court.  And I would like to make some --

15       THE COURT:  Take another shot.

16       MR. THOMPSON:  Thank you.  Judge, we heard your ruling

17  and we've looked at it in a way that we think that we could

18  proposal to you and to the clerk's office a means by which the

19  burden to the clerk would not be improved or enhanced but that

20  in fact it would allow this court and this office to in fact

21  receive the four hundred dollar filing fee.  If I go down to

22  South Carolina to the clerk in Charleston division and file a

23  complaint which will later be put into the JPML and transferred

24  into this court, I will pay that clerk in Charleston four

25  hundred dollars.

1          THE COURT:  The clerk has to kick most of that back to

2     Washington anyway.

3          MR. THOMPSON:  But the clerk gets credit for that

4     filing.  That case will be sent here and the clerk will enroll

5     it and put it on the Pacer and do those machinations as well.

6          Judge, our proposal would be that we have -- in fact,

7     on our side, we have several residents of Westchester as

8     co-leads and as liaison counsel.  And one option would be to

9     have those persons in essence be required to comply with all

10    the local rules and all the filing rules with regard to

11    physical filing and bring that case to the court for physical

12    filing so that it would not be some effort for electronic

13    filing, and that that filing fee could be paid into this court

14    and that this court would have an opportunity to hold onto it

15    if it wants to.

16         THE COURT:  Here's the problem.  I actually checked

17    because I guess somebody was talking to Judge Smith's chambers

18    about this subject even though I thought I had made myself

19    clear last time.  And I checked on this issue of do we get

20    credit if a case is filed elsewhere and transferred here and we

21    do according to the MDL Panel.  The money is, as I said,

22    Washington gobbles up most of that.

23         The main issue I have, and this is because even though

24    we're a big court in a metropolitan area, we are in the Dark

25    Ages in some aspects of our clerk's office operation, and

1   although I am told that at some point in the foreseeable future

2   we will no longer be manually opening cases, people still do

3   that both here and in Manhattan.  That's the problem.  A flood

4   of hundreds of cases is just going to bring everybody to a

5   halt.  If we were doing it like more of our technologically

6   advanced sister courts where the lawyers upload everything it

7   would be very different.  But our court has been rather

8   conservative in terms of doing things electronically and we're

9   catching up to other people.  And given the personnel shortages

10   in our clerk's office, where we've had to get rid of people,

11   which is awful, we just don't have the bodies, literally.

12   Because as I said, this doesn't reflect well on the speed with

13   which we have gotten ourselves into the 21st Century, but if

14   Mr. Kekatos walked the case over to the clerk's office, there's

15   still somebody who is going to spend an hour or 20 minutes or

16   whatever it takes inputting stuff and it's just too many cases

17   and too few people.

18          I adhere to my ruling.  Should we join the 21st

19   Century, we can revisit.  Maybe in a few months time we'll be

20   up to speed.  And it wouldn't be bad, it probably would be a

21   lot easier if the lawyers were doing all the work that our

22   clerk's office is currently doing.  But right now we're not

23   going to have direct filing.

24          MR. THOMPSON:  Thank your Honor.

25          THE COURT:  All right.  Anything else for today?

1          MS COOK:  Your Honor, two things I wanted to raise.

2     One is I wanted to make sure that your Honor was aware of the

3     recent ruling by the JPML denying transfer of several cases

4     that did not involve injuries related to perforations.

5          THE COURT:  Yes, I saw that.

6          MS COOK:  Okay.  And the other issue I wanted to raise

7     is just sort of one of's next steps.  Yesterday we were before

8     Judge Martinotti.  Andfor the next conference, what he told us

9     to work on in addition to finishing up our ESI discussions and

10    starting to move forward with discovery is negotiating a

11    deposition protocol since under the plaintiffs' proposal, which

12    I'm not sure if you adopted these preliminary deadlines they

13    proposed, but they had proposed a deadline for 30(b)(6)

14    depositions of November 1st.  So it looks like depositions of

15    Bayer personnel will be starting in the near future and

16    certainly before the conference after the next one, so if we

17    could discuss a deposition protocol at the next conference that

18    would be helpful.

19         THE COURT:  Yes.  What would you just generally be

20    covering in that protocol?

21         MS COOK:  The deposition protocols generally cover the

22    length of depositions, coordination between the state

23    jurisdictions and the MDL, limitations on taking additional

24    depositions of witnesses, cross-noticing depositions, number of

25    questioners for each side who can attend the deposition, other

D8eimirc ag                    CONFERENCE

1    issues like that.  And yesterday with Judge Martinotti, we said

2    that we would put together a draft and send it over to the

3    plaintiffs in the near future and start the phone calls.

4          THE COURT:  Yes.  That sounds like a good idea.

5    Because I do intend to adopt the dates that plaintiff suggested

6    that precede the start of generic and case-specific fact

7    discovery.  So hopefully you can get to yes.  If you can't,

8    either Judge Smith or both of us will take you up at the next

9    conference.

10         Can you, Ms Cook, send me a proposed order with the

11   discovery schedule we talked about today, which is essentially

12   plaintiffs' but with the tweak that we discussed.  I will enter

13   that.  I will enter the plaintiffs' fact sheet order and we

14   have a proposed order regarding the defendants fact sheet and I

15   think we can enter that one too.

16         MS COOK:  Your Honor, one question about one of the

17   preliminary deadlines in the plaintiffs' schedule.  They have a

18   deadline of October 1st for the deadline for the production of

19   the first fourteen custodians and other initial document

20   production.  I'm not sure what that last part means.  And I'm

21   also not sure if we'll be ready to produce, for example, all of

22   the databases that we've discussed.  So I would prefer to just

23   end it at the custodians, and we'll do a rolling production of

24   the databases as we are able.  There are continuing discussions

25   with them about the format and other things of those databases.

D8eimirc ag                    CONFERENCE

1          THE COURT:  I think it's reasonable to give you more

2     time to do a rolling production but should we put a date in

3     somewhere about when that's going to end?  Mr. Ronca, did you

4     want to say something?

5          MR. RONCA:  I was just getting ready in case I needed

6     to say something.

7          THE COURT:  October 1st as the deadline for the first

8     fourteen and I don't know, December 1 for remainder of

9     discovery, does that sound reasonable?

10         MS COOK:  Yes, your Honor.  That would be fine.

11         THE COURT:  Remaining paper discovery.

12         MS COOK:  I would say the remaining initial document

13    production becasue we may get additional requests.

14         MR. RONCA:  And we don't have an agreement yet on the

15    scope of what we're going to get.  We're going to work on that.

16    And I assume that's one of the things we can talk to Magistrate

17    Judge Smith about?

18         THE COURT:  Yes.

19         THE COURT:  All right, have we exhausted ourselves for

20    our agenda?  Thank you all very much.  Enjoy the rest of the

21    summer if you can.  I'm going to hang up to those folks on the

22    phone.  Take care.

23         (Proceedings adjourned)

24

25