**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

**MIRENA IUD PRODUCTS LIABILITY**                13-MD-2434 (CS)
**LITIGATION**

*This document relates to:*

*Kalaki Clarke, et al. v. Bayer Corp., et al.*
*Case Number 7:13cv2816*

===============================

### AMENDED CIVIL ACTION COMPLAINT

Plaintiffs Kalaki Clarke, Tiffany Gregg, Sylvia Montes, Evelyn Ramirez and Toyana Robinson ("Plaintiffs"), by their undersigned counsel, bring this Amended Complaint against Defendants Bayer Corporation, Bayer Healthcare, LLC, Bayer Pharmaceuticals Corp., Bayer Healthcare Pharmaceuticals, Inc., Berlex Laboratories, Inc., Berlex, Inc., Bayer AG and Bayer OY (hereinafter collectively referred to as "Bayer" or "Defendants"), and based upon personal knowledge, information, and belief, allege as follows:

### INTRODUCTION

1.      This products liability action relates to the design, development, manufacture, testing, marketing, promotion, distribution, advertisement, and sale of Mirena®, an intrauterine device (an "IUD"), which is dangerous and defective in that after proper placement, Mirena® may perforate the uterus and migrate into other parts of the body, requiring surgical removal and causing other medical complications, including, without limitation, miscarriage, sterility, and long term scarring, pain, suffering, emotional distress, and anguish, as well as other permanent medical problems.

2.      Plaintiffs have suffered personal injuries as a direct and proximate result of Defendants' negligent and wrongful misconduct in connection with the design, development, manufacture, testing, packaging, promotion, advertising, marketing, distribution, labeling, and

sale of the hormonal contraceptives known as Mirena® (hereinafter referred to as "Mirena®" or "the Product"), which is an IUD that releases the progestin hormone levonorgetrel.

3.      When marketing Mirena®, Bayer represented that it would provide a simple method of birth control for active, busy women, and would generally improve their lives, including their sex lives.  Defendants significantly downplayed the risks of using the Product.

4.      Contrary to Bayer's representations about a host of benefits of using Mirena®, the Product is not safe and simple; and is prone to becoming dislodged and penetrating the uterine wall, migrating out of the uterus, and travelling to other parts of the body, endangering or damaging internal organs through the formation of scar tissue or adhesions, necessitating surgical procedures including a medically necessary hysterectomy, and raising the risk of ectopic pregnancy and miscarriage, as well as permanent sterility—certainly not the "simple" birth control choice the patient agreed to or wanted.

5.      Since Defendants first began selling Mirena® in the United States in 2000, the product labeling and product information for Mirena® failed to contain adequate information, instructions, and warnings concerning these risks.

## PARTIES

I.    **PLAINTIFFS**

6.      At all times referenced herein, Plaintiff Kalaki Clarke was a citizen and resident of San Pedro, California. Mirena® was implanted in Ms. Clark on January 16, 2012.  The Mirena® later migrated into her abdomen and then her pelvis, requiring surgical removal.  As a result, Ms. Clarke suffered physical and emotional injuries and sustained financial losses.

7.      At all times referenced herein, Plaintiff Tiffany Gregg was a citizen and resident of Fontana, California.  Mirena® was implanted in Ms. Gregg on May 11, 2011, and later migrated out of her uterus, requiring surgical removal. As a result, Ms. Gregg suffered physical and emotional injuries and sustained financial losses.

8.      At all times referenced herein, Plaintiff Sylvia Montes was a citizen and resident of Fontana, California.  Mirena® was implanted in Ms. Sylvia Montes on October 27, 2011, and

1134811.1

later migrated out of her uterus, requiring surgical removal.  As a result, Ms. Montes suffered physical and emotional injuries and sustained financial losses.

9.      At all times referenced herein, Plaintiff Evelyn Ramirez was a citizen and resident of Azusa, California. Mirena® was implanted in Ms. Ramirez on December 10, 2009, and later migrated out of her uterus, requiring surgical removal.  As a result, Ms. Ramirez suffered physical and emotional injuries and sustained financial losses.

10.      At all times referenced herein, Plaintiff Toyana Robinson was a citizen and resident of Monroe Valley, California. Mirena® was implanted in Ms. Toyana Robinson on November 5, 2005, and later migrated out of her uterus, requiring surgical removal.  As a result, Ms. Robinson suffered physical and emotional injuries and sustained financial losses.

## II.    **DEFENDANTS**

11.      Defendant Bayer Healthcare Pharmaceuticals, Inc., is and at all relevant times was, a corporation organized under the laws of Delaware, with its principal place of business at 340 Changebridge Road, P.O. Box 1000, Montville, New Jersey 07045-1000.

12.      Defendant Bayer Healthcare Pharmaceuticals, Inc. was formerly known as Berlex, Inc., which was formerly known as Berlex Laboratories, Inc., and is the same corporate entity as Berlex, Inc. and Berlex Laboratories, Inc.

13.      Defendant Bayer Healthcare Pharmaceuticals, Inc. is the holder of the approved New Drug Application ("NDA") for Mirena®.

14.      Defendants Berlex Laboratories, Inc. and Berlex, Inc. are, and at all times relevant were, foreign corporations with their headquarters and principal places of business at Montville, New Jersey, with a post office address of P.O. Box 1000, Montville, New Jersey, 07045, and a place of business at 6 West Belt Road, Wayne, New Jersey 07470.

15.      Defendants Berlex Laboratories, Inc. and Berlex, Inc. were integrated into Bayer Healthcare AG and operate as an integrated specialty pharmaceuticals business under the new name, Defendant Bayer Healthcare Pharmaceuticals, Inc.

1134811.1

16.     As of January 1, 2008, Defendant Bayer Pharmaceuticals Corporation was merged into Defendant Bayer Healthcare Pharmaceuticals, Inc.

17.     Defendant Bayer Healthcare, LLC is, and at all relevant times was, a corporation organized under the laws of Delaware with its headquarters and principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania.

18.     Defendant Bayer Healthcare, LLC is a wholly owned subsidiary of Defendant Bayer Corporation.

19.     Defendant Bayer Pharmaceuticals Corporation is, and at all relevant times was, a corporation organized under the laws of Delaware, with its principal place of business at 1400 Morgan Lane, West Haven, Connecticut.

20.     Defendant Bayer AG is a parent holding company that is organized and exists under the laws of the Federal Republic of Germany, and is headquartered at 51368 Leverkusen, Germany.

21.     Defendant Bayer AG is currently the third largest pharmaceutical company in the world.

22.     Defendant Bayer AG is the parent holding company of all other named Defendants.

23.     Defendant Bayer Corporation is a United States holding company.  It has its headquarters and principal place of business in the United States and is located at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

24.     Defendant Bayer Corporation is the North American subsidiary of Bayer AG. Bayer Corporation encompasses the corporate-center functions that support Bayer subgroups in North America: Bayer Crop Science, Bayer Healthcare and Bayer Material Science.

25.     Defendant Bayer Oy is organized and exists under the law of Finland and is headquartered at Pansiontie 47 20210 Turku, Finland.

26.     Defendants Bayer Corporation, Bayer Healthcare LLC, Bayer Pharmaceuticals Corporation, Bayer Healthcare Pharmaceuticals, Inc., Berlex Laboratories, Inc., Berlex, Inc.,

Bayer AG, and Bayer Oy shall be referred to individually by name or collectively as "Bayer" or the "Bayer Defendants."

27.     At all times alleged herein, Bayer Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns, and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.  At all times herein mentioned each of the Bayer Defendants was the agent, servant, partner, predecessor in interest, aider and abettor, co-conspirator, and joint venturer of each of the remaining defendants herein, and was at all times, operating and acting with the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture.

28.     Defendant Bayer Healthcare Pharmaceuticals, Inc. is the current owner of the patent relating to Mirena®.

29.     Defendant Bayer Oy is the current owner of the trademark relating to Mirena®.

30.     At all times relevant, Bayer Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, advertising, and delivering, and/or introducing into interstate commerce throughout the United States and in the State of California, either directly or indirectly through third parties, subsidiaries or related entities, the intrauterine device known as Mirena®.

31.     There exists and at all times mentioned there existed a unity of interest in ownership between and among all Bayer Defendants such that any individuality and separateness between and among them has ceased.  Because Bayer Defendants are the alter egos of one another and exert control over each other, adherence to the fiction of the separate existence of these Defendants as entities distinct from one another will permit an abuse of the corporate privilege, sanction fraud, and promote injustice.

32.     At all times relevant to the matters alleged in this Amended Complaint, each Bayer Defendant acted as the agent of the other Bayer Defendants and acted within the course and scope of the agency, regarding the acts and omissions alleged.  Together, the Bayer

Defendants acted in concert and/or aided and abetted each other and conspired to engage in the common course of misconduct alleged herein for the purpose of enriching themselves at the expense of Plaintiffs.

33.     At all relevant times, Bayer AG was the publicly traded holding company with wholly owned subsidiaries, that it controlled, which designed, manufactured, marketed, supplied and sold to distributors, physicians, hospitals, patients and medical practitioners certain IUDs known as Mirena® to be implanted in patients throughout the United States, including in the State of New Jersey.

34.     At all relevant times, each of the Defendants and their directors and officers acted within the scope of their authority of each Defendant and on behalf of each other Defendant. During the relevant times, Defendants possessed a unity of interest between themselves and exercised control over their subsidiaries and affiliates.  As such, Defendants are each individually, as well as jointly and severally, liable to Plaintiffs for Plaintiffs' injuries, losses, and damages.

## JURISDICTION AND VENUE

35.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs and Defendants are citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

36.     Venue in this action properly lies in the Central District of California pursuant to 28 U.S.C. §§ 1391 (a) and (c), as Plaintiffs Kalaki Clarke, Tiffany Gregg, Sylvia Montes and Evelyn Ramirez reside in this District and a substantial number of the events, actions or omissions giving rise to Plaintiffs' injuries and claims occurred in this District.  At all times material hereto, Defendants conducted substantial business in the State of California.

37.     Upon information and belief, at all relevant times, Defendants were present and transacted, solicited and conducted business in State of California, through its employees, agents, and/or sales representatives, and derived substantial revenue from such business.

1134811.1

38.     At all relevant times, Defendants placed the dangerous and defective devices into the stream of interstate commerce that were implanted in Plaintiffs Kalaki Clarke, Tiffany Gregg, Sylvia Montes, Evelyn Ramirez and Toyana Robinson.

<b>FACTUAL ALLEGATIONS</b>

**III.    DESIGN, USE AND HISTORY OF MIRENA® IUD**

39.     The Bayer Defendants hold themselves out as the foremost and current market leaders in contraceptive products, including Mirena®.

40.     Mirena® is small device made of soft, flexible plastic.  Mirena® has a T-shaped polyethylene frame (T-body) that is 32 mm in both the horizontal and vertical directions.  It has a steroid reservoir (hormone elastomer core) around the vertical stem.  The reservoir consists of a white cylinder, made of a mixture of levonorgestrel and silicone (polydimethylsiloxane), containing a total of 52 mg levonorgestrel.

41.     Levonorgestrel is a progestin that is released by Mirena® slowly, over time, directly into the uterus.  Levonorgestrel is used to prevent fertilization by inhibition of ovulation and thinning the uterine lining. Initial release rate of levonorgestrel is 20 mcg per day.  This rate is reduced by about 50% after 5 years.

42.    The reservoir that holds the levonorgestrel is covered by a semi-opaque silicone (polydimethylsiloxane) membrane. The polyethylene of the T-body is compounded with barium sulfate, which makes it visible on x-ray. A monofilament brown polyethylene removal thread is attached to a loop at the end of the vertical stem of the T-body.



43.    Mirena® is meant to be implanted into a woman's uterus by a trained health care provider during an office visit using a separate inserter device.

44.    Mirena® is indicated to prevent pregnancy and to treat heavy periods.  According to the package labeling for physicians, Mirena® "is recommended for women who have had at least one child."  This suggests that carrying a child to term may be complicated after Mirena® use.

45.    Bayer explains in its product insert that:

It is not known exactly how Mirena® works. Mirena® may work in several ways. It may thicken your cervical mucus, thin the lining of your uterus, inhibit sperm movement and reduce sperm survival. Mirena® may stop release of your egg from your ovary, but this is not the way it works in most cases. Most likely, these actions work together to prevent pregnancy. Mirena® can cause your menstrual bleeding to be less by thinning the lining of the uterus.

1134811.1



46.    Mirena® is intended to remain implanted for up to five years and to provide contraceptive protection during that time.  The device is intended to be removed at five years.

47.    According to the product insert, the use of Mirena® is associated with certain risks, including increased risk of pelvic inflammatory disease, ovarian cysts, irregular bleeding, and amenorrhea.  The Product insert also warns that Mirena® can become embedded in the uterus, can perforate the uterus, or be expelled from the uterus.

48.    The product insert also states that the risk of ectopic pregnancy and intrauterine pregnancy are increased while the IUD is in place.  It does not warn of ectopic pregnancy after Mirena® is removed or if it is dislodged.

49.    The product inserts also states that "Patients should be reexamined and evaluated 4-12 weeks after insertion and once a year thereafter, or more frequently if clinically indicated."

50.    The materials also advise doctors to counsel their patients to check that the "threads attached to Mirena® are in place after each menstrual cycle to ensure that it has not become displaced or been expelled."

51.    In other words, the burden of determining if the Product has dislodged and is floating somewhere in a patient's body is on the patient herself.  Defendants unreasonably assume that the patient can and will accomplish the difficult or impossible task of periodically locating the tiny strings attached to Mirena® that would be present at the base of her cervix on self-exam if the IUD had not migrated.

52.     Moreover, the recommended examinations, both the self-exams and the doctor exams, are not intended to serve as preventative exercises.   Indeed, if the strings were not present on examination it would mean that the Product had dislodged or been displaced.  At that point, the IUD would have already migrated and could be causing damage to other parts of the body and exposing women to risky ectopic pregnancies and additional medical procedures and surgeries.  These instructions about examinations for the strings simply lulled doctors and their patients into a false sense of security and misled them about the real and increasing risks of spontaneous migration.

53.     The warnings also misleadingly imply that complications and injury may occur when Mirena® is placed, not years afterward even if it is properly placed.

54.     The symptoms of displacement and uterine penetration and migration can be deceptive because the migration can cause severe cramps and abdominal pains, which can be missed by patients not adequately warned to be aware of the risks and potential symptoms.

55.     Patients such as Plaintiffs Clarke, Gregg, Montes, Ramirez and Robinson do not purchase Mirena® directly from Defendants but from the medical care provided who implants it. Unlike a pharmaceutical drug, patients who are implanted with Mirena® are generally not provided with the package insert and not made aware of warnings contained in the package insert.

## IV.   MIRENA®'S HISTORY

56.     Defendant Berlex Laboratories, Inc. characterizes Mirena® as a drug and sought approval through a New Drug Application (NDA) from the FDA to sell Mirena® as a drug.

57.     On or about December 6, 2000, the FDA approved Mirena® for sale in the United States as a hormonal contraceptive drug for women who had given birth to at least one child pursuant to a New Drug Application (an "NDA") submitted by Berlex Laboratories, Inc. Notably, an NDA is used to approve a pharmaceutical drug, not a device.  Therefore, this Product was approved as a drug, not a device.

58.     In 2009, the FDA also approved Mirena® to treat heavy menstrual bleeding in

women who prefer intrauterine contraception as a method of birth control. This was the first time that the FDA has approved an intrauterine device for this purpose. Bayer Healthcare Pharmaceuticals now holds the NDA for Mirena®.

59.     Defendants represent in the Mirena® patient brochure that 2,000,000 Mirena® intrauterine devices have been placed in women in the U.S. since 2000.

60.     Mirena®'s label does not warn about spontaneous migration of the IUD, but only states that migration may occur if the uterus is perforated during insertion.

61.     Bayer has been warned by the FDA for overstating the efficacy of Mirena® while understating the potential concerns of safety risks.

62.     More than 45,966 adverse events were reported to the FDA associated with Mirena® between November 1, 1997 and June 30, 2012. Most of the adverse events reported are associated with uterine migration and perforation.

63.     Complications from Mirena® may not present until several years after implantation due to the long-term uterine thinning, increasing the risk of perforations, long after insertion—the time when that problem is expected to surface.

## V.     MIRENA®'S INADEQUATE WARNINGS AND MISLEADING MARKETING

64.     Mirena®'s marketing slogan is "Keep Life Simple."

65.     In March of 2009, Department of Health and Human Services' Division of Drug Marketing, Advertising, and Communications ("DDMAC") warned Bayer HealthCare Pharmaceuticals that its sponsored internet links "are misleading because they make representations and/or suggestions about the efficacy" of Mirena® "but fail to communication any risk information associated with the use" of the drug. See Exhibit A (3/26/2009 warning letter) (emphasis in the original). DDMAC stated that Defendants' internet links regarding Mirena® "misleadingly suggest that … Mirena® [is] safer than has been demonstrated" because the links omitted "the most serious and frequently occurring risks associated with the drugs." Id.

66.     DDMAC warned that the Mirena® sponsored internet links "inadequately communicate the drugs' indications … overstate the efficiency of the drug." Id. Thus the FDA

warned that the sponsored links misbrand the drugs in violation of the Federal Food, Drug, and Cosmetic Act (the "Act") and FDA implementing regulations…." Id. DDMAC instructed Bayer to immediately "cease the dissemination of violative promotional materials for[two other drugs] and Mirena®. Id. at 4.

67.     Defendants also aggressively promoted Mirena® and made unsubstantiated representations about it through a consumer-directed marketing program called the "Mirena® Simple Style Statements Program," commonly called a "Mirena® Party."

68.     To facilitate Mirena® Parties, Bayer partnered with the "Mom Central" social web platform and enlisted a "Mom Central representative" who would host the "Party" and extol the virtues of Mirena® to a group of potential customers in a private setting, such as a home or a private room in a restaurant. The Mom Central representative followed a Bayer-endorsed script. A nurse practitioner also made a presentation at the Party from a script.

69.     The Mom Central representative introduced the nurse practitioner, Barb Dehn, as "a practicing Women's Health Nurse Practitioner, award-winning author and nationally recognized health expert" who would speak about "romance and how to find simple ways to reconnect with our partners."

70.     Ms. Dehn told the women that Mirena® would make them "feel better about approaching the romance in [their] lives" and would provide "simple ways to reconnect" with their partners.

71.     Ms. Dehn conducted a Q&A in which she would ask the women assembled: "How many of you feel so busy that you often can't find time to take care of yourself? And do you think this impacts your level of intimacy?;" whether they feel "overwhelmed" by their schedules so that "intimacy is much more of a 'to do' on a list rather than a desire;" and whether they could be more intimate with their partners if they did not have to "worry" about contraception or taking a pill.

72.     At the conclusion of each presentation, Ms. Dehn recommended that the women choose Mirena® as a "birth control method that allows for spontaneous intimacy."

73.     The participants were then treated to a fashion show.

74.     While Bayer's aggressively emphasized that Mirena® would enhance romance and intimacy and generally improve the quality of life, Bayer omitted information about the potential serious side effects and risks associated with Mirena®.

75.     Although the Simple Style program represented that Mirena® use would increase the level of intimacy, romance and emotional satisfaction between sexual partners, DDMAC determined that these claims were unsubstantiated and, in fact, pointed out that Mirena®'s package insert states that at least 5% of clinical trial patients reported a decreased libido after use.

76.     The Simple Style program script also intimated that Mirena® use can help patients "look and feel great."  Again, DDMAC found that these claims are unsubstantiated and that Mirena® can cause a number of side effects, including weight gain, acne, and breast pain or tenderness.

77.     The portion of the Simple Style script regarding risks omitted information about serious conditions, including susceptibility to infections and the possibility of miscarriage if a woman becomes pregnant on Mirena®.

78.     DDMAC issued a warning letter for this false and misleading advertising program to Bayer HealthCare Pharmaceuticals, Inc. on December 30, 2009.  See Exhibit B (12/30/2009 warning letter).  The letter warned that the claims made in the consumer-directed program "misleadingly overstate the proven efficacy of Mirena®."  Id.

79.     DDMAC warned that Bayer Defendants' representations "clearly indicate that the use of Mirena® instead of other means of contraception will result in increased levels of intimacy, romance, and by implication, emotional satisfaction.  These claims misleadingly overstate the proven efficacy of Mirena®.  FDA is not aware of any evidence that suggests that women using Mirena® for birth control experience and increase in reconnection, romance, or intimacy with their partners.  Claims that state or suggest such quality of life outcomes . . . must

be supported by substantial evidence…. We note that, according to Mirena® PI, at least 5% of clinical trial patients reported decreased libido as a side effect of Mirena® use. Patents also experienced abdominal/pelvic pain, nausea, headache, nervousness, and depressed mood, which could adversely affect a woman's feeling relating to romance or intimacy." Id. at 3-4. (emphasis in the original)

80.     DDMAC again warned Bayer that the statement in the script that "Mirena® has no daily, weekly, or monthly routines to comply with" as compared to other birth control methods was false and misleading because instructions in the Mirena® product insert advise that patients should be "reexamined and evaluated… 4-12 weeks after insertion and once a year thereafter, or more frequently if clinically indicated," and that patients should be instructed to check that the "threads attached to Mirena® are in place after each menstrual cycle to ensure that it has not become displaced or been expelled." Id at 5. (emphasis in the original)

81.     For these reasons, DDMAC warned Bayer that its advertising program misbranded Mirena® in violation of the Federal Food, Drug and Cosmetic Act." Id.

## VI.   **PLAINTIFFS WERE SERIOUSLY INJURED AS A RESULT OF IMPLANTATION WITH THE DEFECTIVE MIRENA®  IUD.**

82.     Plaintiff Clarke had a Mirena® IUD implanted into her uterus on January 6, 2012 by Dr. Ayanna Walden in Los Angeles, California. Since that time, she has suffered numerous physical injuries and various physical manifestations of extreme emotional distress. Ms. Clarke's IUD migrated out of her uterus and was located by x-ray between her abdominal and pelvic cavity. Surgery was required to remove it on December 15, 2012.

83.     Plaintiff Gregg had a Mirena® IUD implanted into her uterus in or about May 11, 2011 by Dr. Sung Ho Lee in Fontana, California. Since that time, she has suffered numerous physical injuries and various physical manifestations of extreme emotional distress. Ms. Gregg's IUD perforated her uterus and was located by ultrasound and CT scan. Surgery was required to remove it on January 19, 2012.

84.     Plaintiff Montes had a Mirena® IUD implanted into her uterus on October 27,

2011 at Loma Linda Family Medical Group in Loma Linda, California. Since that time, she has suffered numerous physical injuries and various physical manifestations of extreme emotional distress. Ms. Montes's IUD migrated out of her uterus. Surgery was required to locate and remove it on March 29, 2012.

85.    Plaintiff Ramirez had a Mirena® IUD implanted into her uterus in or about December 10, 2009 by Dr. Deborah Ann Nakielski in Baldwin Park, California. Since that time, she has suffered numerous physical injuries and various physical manifestations of extreme emotional distress. In or around January, 2011, Ms. Ramirez returned to the clinic to have the device removed. It was determined that she would need surgical removal, and on or about January 7, 2011, she underwent an attempt to surgically remove the IUD. Unfortunately, the surgeon was unable to remove the IUD at that time due to significant embedment in the uterine wall. An additional surgery was required to locate and remove it on March 31, 2011. After her second surgery, Ms. Ramirez had severe pain and required three days of hospitalization, and continues to have complications.

86.    Plaintiff Robinson had a Mirena® IUD implanted into her uterus in or about November 5, 2005 by Dr. Debra Gordon in Moreno Valley, California. Since that time, she has suffered numerous physical injuries and various physical manifestations of extreme emotional distress. On March 8, 2011, Ms. Robinson received a call from Dr. Jui-Chun Wu informing her that a cat scan showed the Mirena® had migrated outside her uterus. On April 27, 2011 Ms. Robinson underwent surgery to remove the Mirena®.

## COUNT I
### Negligence

87.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

88.    Defendants had a duty to Plaintiffs to exercise reasonable care in designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Mirena® into the stream of commerce, including a duty to assure that Mirena®

would not spontaneously penetrate the uterus and migrate into other parts of the body, requiring surgical removal.

89.     Defendants failed to exercise ordinary care and/or were reckless in designing, researching, manufacturing, marketing, supplying, promoting, packaging, selling, testing, quality assurance, quality control, and/or distribution of Mirena® into interstate commerce in that Defendants knew or should have known that using Mirena® caused a risk of unreasonable, dangerous complications, including spontaneous uterine penetration and migration.

90.     Despite the fact that Defendants knew or should have known that Mirena® would cause spontaneous uterine penetration and migration, they continued to market, manufacture, distribute, and/or sell Mirena® to consumers, including Plaintiffs, without adequate warnings or information about these adverse events.

91.     Defendants knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of their failure to exercise ordinary care, as set forth above.

92.     Defendants' negligence and/or recklessness was a substantial factor and legal and proximate cause of Plaintiffs' injuries, harm, and economic loss which they suffered and/or will continue to suffer.

93.     Defendants' conduct, as described in this cause of action was a substantial factor and legal and proximate cause of the injuries and damages sustained by Plaintiffs. Defendants demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to Plaintiffs' rights, safety, and welfare, and that such intentional acts and omissions were substantial factors in causing their injuries.

94.     As a foreseeable, direct, and proximate result of Defendants' conduct, Plaintiffs have suffered, and continue to suffer, permanent injuries to their person, body, and health, including but not limited to, surgery to remove the Mirena®, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, all to their general damage.

95.     As a foreseeable, direct, and proximate result of Defendants' conduct, Plaintiffs

have and/or will suffer loss of income and earnings, past, present, and future and earning capacity in an amount which has not as yet been fully ascertained and which will be asserted according to proof at trial.

96.     As a foreseeable, direct, and proximate result of Defendants' conduct, Plaintiffs necessarily incurred incidental expenses and damages in an amount which has not as yet been fully ascertained and which will be asserted according to proof at trial.

97.     As Defendants' conduct was and is willful, malicious, oppressive, and outrageous. Defendants demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to Plaintiffs' rights, safety, and welfare, such that Plaintiffs, for the sake of example and by way of punishing Defendants, seeks punitive damages according to proof at trial.

98.     Plaintiffs are informed and believe that in doing the acts alleged in this Amended Complaint, Defendants acted with oppression, fraud, and malice, and Plaintiffs are therefore entitled to punitive damages to deter Defendants and others from engaging in similar conduct in the future.  The wrongful conduct described herein was undertaken with the advance knowledge, authorization, and ratification of Defendants' officers, directors, or managing agents.

## COUNT II
## Strict Liability - Failure To Warn

99.     Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

100.     Defendants researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, marketed, and/or introduced Mirena® into the stream of commerce, and directly advertised or marketed Mirena® to consumers or persons responsible for consumers.  Defendants therefore had a duty to both Plaintiffs and Plaintiffs' physician to warn of risks associated with the use of the Product.

101.     Defendants had a duty to warn of adverse incidents, which it knew or had reason to know, can be caused by the use of Mirena® and/or are associated with the use of Mirena®.

1134811.1

102.    Mirena® was defective due to inadequate post-marketing warnings and/or instructions because, after Defendants knew or should have known of the risk of the spontaneous uterine penetration and migration of Mirena®, they failed to provide adequate warnings to consumers of the Product, including Plaintiffs and Plaintiffs' physicians, and continued to aggressively promote Mirena®.

103.    Due to the inadequate warning regarding the risk of the spontaneous uterine penetration and migration of Mirena®, Mirena® was in a defective condition and unreasonably dangerous at the time that it left Defendants' control.

104.    Defendants' failure to adequately warn Plaintiffs and Plaintiffs' prescribing physicians of the risk of spontaneous uterine penetration and migration prevented Plaintiffs' and their prescribing physicians from correctly and fully evaluating the risks and benefits of Mirena®.

105.    Had Defendants adequately warned Plaintiffs of the potential for spontaneous uterine penetration and migration, Plaintiffs would not have purchased or used Mirena® and could have chosen to request other forms of contraception.

106.    Upon information and belief, had Plaintiffs' prescribing physician been adequately warned of the risk of the spontaneous uterine penetration and migration, Plaintiffs' prescribing physicians would have discussed that risk with Plaintiffs and/or would not have recommended it.

107.    As a foreseeable and proximate result of Defendants' wrongful acts and omissions of Plaintiffs were caused to suffer injuries and damages described above.

108.    Defendants' failure to warn of the risk of Mirena®'s spontaneous uterine penetration and migration was a substantial factor and legal and proximate cause of Plaintiffs' injuries and damages.  Defendants' demonstration of an entire want of care establish that their acts and omissions were the result of actual conscious indifference to Plaintiffs' rights, safety, and welfare, and that such intentional acts and omissions were substantial factors in causing their injuries.

109.    In particular, Plaintiffs will show at trial that, as alleged here, that Defendants'
intentional, grossly wanton acts and omissions were substantial factors in causing their injuries.
Defendants demonstrated such an entire want of care as to establish that their acts and omissions
were the result of actual conscious indifference to Plaintiffs' rights, safety, and welfare and
Plaintiffs, for the sake of example and by way of punishing Defendants, seek punitive damages
according to proof.

**COUNT III**
**Strict Liability - Defective Design**

110.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding
paragraphs.

111.    Mirena® was expected to and did reach the intended consumers, handlers, and
persons coming into contact with the Product without substantial change in the condition in
which Defendants produced, manufactured, sold, distributed, labeled, and marketed it.

112.    At all relevant times Defendants manufactured, designed, and labeled Mirena® in
an unsafe, defective, and inherently dangerous condition, which was dangerous for use by the
public, and in particular, by Plaintiffs.

113.    As Defendants researched, tested, developed, designed, licensed, manufactured,
packaged, labeled, distributed, sold, and marketed Mirena®, it was defective in design and
formulation in that when it left the hands of the manufacturers and/or suppliers the foreseeable
risks exceeded the alleged benefits associated with Mirena®.

114.    As Defendants researched, tested, developed, designed, licensed, manufactured,
packaged, labeled, promoted, advertised, distributed, sold, and marketed Mirena®, it was
defective in design and formulation, because when it left the hands of Bayer's manufacturers and
suppliers, it was unreasonably dangerous and was also more dangerous than the ordinary
consumer would expect.

115.    At all times herein mentioned, Defendants knew and had reason to know that the
Product was defective and inherently unsafe, especially when used in a form and manner

instructed and provided by Defendants.

116.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, common, intended use.

117.    At the time Plaintiffs used Mirena®, it was being used for its intended purpose and manner.

118.    Defendants researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed a defective product that caused an unreasonable risk to the health of consumers and to Plaintiffs in particular, and Defendants are therefore strictly liable for the injuries and damages sustained by Plaintiffs.

119.    At the time the Mirena® left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the Product.  This was demonstrated by the existence of other IUDs which had a more established safety profile and a considerably lower risk profile.

120.    Plaintiffs could not, by the reasonable exercise of care, have discovered Mirena®'s defects and perceived its danger.

121.    The defects in the Product were the substantial and contributing factors in causing Plaintiffs' injuries.

122.    As a foreseeable, direct, and proximate result of Defendants' wrongful acts and omissions, Plaintiffs were caused to suffer from injuries and damages, including the spontaneous uterine penetration and migration of Mirena®, requiring surgical removal.

123.    Due to the unreasonably dangerous condition of Mirena®, Defendants are strictly liable to Plaintiffs.

124.    The defect in the Product was a substantial factor and legal and proximate cause of Plaintiffs' injuries and damages, and Defendants demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to

Plaintiffs' rights, safety, and welfare, and Bayer's intentional acts and omissions were substantial factors in causing Plaintiffs' injuries.

125.    As a foreseeable, direct, and proximate result of Bayer's misconduct, Plaintiffs suffered severe and permanent injuries, losses, and damages alleged above.

126.    In particular, Plaintiffs will show at trial Bayer's intentional, grossly wanton acts were substantial factors in causing their injuries. Bayer demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to Plaintiffs' rights, safety, and welfare and Plaintiffs, for the sake of example and by way of punishing Defendants, seeks punitive damages according to proof

## COUNT IV
### Breach Of Express Warranty

127.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

128.    Defendants expressly warranted that Mirena® was safe for its intended use. Mirena® did not conform to these express representations, including but not limited to, a risk spontaneous uterine penetration and migration.

129.    Defendants made express warranties that were a part of the basis for Plaintiffs' use of Mirena® and Plaintiffs relied on these warranties in deciding to use Mirena®.

130.    At the time Defendants made these express warranties, they had knowledge of the purpose for which Mirena® was to be used, and warranted it to be in all respects safe when used as directed, and effective and proper for such purpose.

131.    Defendants breached its express warranty in that Mirena® does not conform to Defendants' express representations because Mirena® is not safe or effective when used as directed and may produce serious side effects, including, among other things, spontaneous uterine penetration and migration requiring surgical removal.

132.    Defendants' breach of warranty was a substantial contributing factor and legal and proximate cause of the injuries and damages Plaintiffs sustained.

1134811.1

133.    Defendants' breach of warranty, was a substantial factor and legal and proximate cause of Plaintiffs' injuries and damages, and Bayer demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to the Plaintiffs' rights, safety, and welfare, and such intentional acts and omissions were substantial factors in causing their injuries.

134.    As a foreseeable, direct, and proximate result of Defendants' conduct Plaintiffs suffered severe and permanent injuries and suffered losses and damages as alleged above.

**COUNT V**
**Breach Of Implied Warranty For A Particular Purpose**

135.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

136.    At all relevant times, Defendants manufactured, distributed, recommended, merchandized, advertised, promoted and sold Mirena®.

137.    Defendants impliedly represented and warranted to the users of Mirena® that it was safe and fit for the particular purpose for which it was to be used, specifically that it is a safe form of contraception.

138.    Defendants' representations and warranties were false, misleading, and inaccurate because Mirena® is unsafe and can lead to spontaneous uterine penetration and migration, requiring surgery.

139.    Plaintiffs relied on Defendants' implied warranty of fitness for a particular use and purpose.

140.    Plaintiffs reasonably relied upon Defendants' skill and representations that Mirena® was safe and fit for its intended use when used as directed, which Plaintiffs did.

141.    Defendants placed Mirena® into the stream of commerce in a defective, unsafe, and inherently dangerous condition.  Mirena® was expected to and did reach users, handlers, and persons coming into contact with the Product without substantial change in the condition in which it was sold.

142.    Defendants breached the implied warranty as Mirena® was not fit for its intended purposes and uses.

143.    Defendants' breach of warranty was a substantial contributing factor and legal and proximate cause of Plaintiffs' injuries, losses, and damages.

144.    As a foreseeable, direct, and proximate result of Defendants' conduct, Plaintiffs suffered severe and permanent injuries to their person, and Plaintiffs suffered losses and damages as alleged.

## COUNT VI
## Breach Of Implied Warranty Of Merchantability

145.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

146.    Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Mirena® as a safe form of contraception.

147.    Defendants marketed, sold and distributed Mirena®, promoted the Product, and impliedly warranted to Plaintiffs that Mirena® was of merchantable quality and fit for the ordinary purpose for which it was intended, specifically that it is a safe form of contraception.

148.    Defendants' representations and warranties were false, misleading, and inaccurate in that Mirena® is unsafe and can lead to spontaneous uterine penetration and migration, requiring surgical removal.

149.    Plaintiffs reasonably relied on Defendants' skill, expertise, and judgment and its representations as to the fact that Mirena® was of merchantable quality.

150.    Mirena® was not of merchantable quality, as warranted by Defendants, in that it carries risk of the spontaneous uterine penetration and migration requiring surgery, and was thus not fit for the ordinary purpose for which it was intended.

151.    Defendants' breach of warranty was a substantial contributing factor and legal and proximate cause of the injuries and losses and damages sustained by Plaintiffs.

152.    As a foreseeable, direct, and proximate result of the aforesaid conduct of

1134811.1

Defendants' conduct, Plaintiffs suffered severe and permanent injuries to their person, and Plaintiffs suffered damages as alleged above.

## COUNT VII
### Violation Of Cal.  Business & Professions Code §17200, et seq.

153.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

154.    Plaintiffs bring this cause of action pursuant to Business & Professions Code § 17204, in their individual capacities and not on behalf of the general public.

155.    California Business & Professions Code § 17200 provides that unfair competition shall mean and include "all unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

156.    The acts and practices described above, were and are likely to mislead the general public and therefore constitute unfair business practices within the meaning of Business and Professions Code § 17200.  The acts of untrue and misleading advertising set forth in preceding paragraphs are incorporated by reference and are, by definition, violations of Business & Professions Code § 17200.  This conduct includes, but is not limited to:

a.    Representing to Plaintiffs, Plaintiffs' physicians, and the general public that Mirena® is safe, fit, and effective for human use, knowing that those representations were false, and concealing from Plaintiffs, Plaintiffs' physicians, and the general public that the Product had a serious propensity to cause injuries to users;

b.    Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that the use of Mirena® was safe for humans, that Mirena® had fewer side effects and adverse reactions than other IUDs, and constituted a convenient and safe form of contraception, knowing these to be false and having no reasonable grounds to believe these representations to be true;

c.    Purposely downplaying and understating the health hazards and risks associated with Mirena®.

1134811.1

157.    As a result of Defendants' conduct, it has been and will be unjustly enriched by the receipt of millions of dollars in ill-gotten gains from the sale and prescription of Mirena® in California, sold in large part as a result of the acts and omissions described herein.

158.    Because of Defendants' misrepresentations and the inherently unfair practice of committing misrepresentations against the public by intentionally misrepresenting and concealing material information, Defendants' acts, described herein, constitute unfair or fraudulent business practices.

159.    Plaintiffs, pursuant to California Business & Professions Code § 17203, seek an order of this Court compelling Defendants to provide restitution and to disgorge the money it collected and the profits it realized as a result of its unfair business practices, and injunctive relief calling for Defendants to cease such unfair business practices in the future.

## COUNT VIII
### Violation Of Cal. Business & Professions Code §17500, et seq.

160.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

161.    Plaintiffs bring this cause of action pursuant to Business & Professions Code § 17535, in their individual capacities and not on behalf of the general public.

162.    California Business & Professions Code § 17500 provides that it is unlawful for any person, firm, corporation, or association to dispose of property or perform services, or to induce the public to enter into any obligation relating thereto, through the use of untrue or misleading statements.

163.    At all material times, Defendants disseminated untrue and misleading statements as defined by Business & Professions Code § 17500 by engaging in the following acts and practices with intent to induce members of the public to purchase and use Mirena® by:

a.    Representing to Plaintiffs, Plaintiffs' physicians, and the general public that Mirena® is safe, fit, and effective for human consumption, knowing that the representations were false and concealing from Plaintiffs, Plaintiffs' physicians, and the general public that

1134811.1

Mirena® had a serious propensity to cause injuries to users;

   b. Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that Mirena® was safe for human use, had fewer side effects and adverse reactions than other IUDs and constituted a convenient and safe form of contraception even though Defendants knew this to be false and had no reasonable grounds to believe these representations to be true;

   c. Purposely downplaying and understating the health hazards and risks associated with Mirena®.

  164. The foregoing practices constitute false and misleading advertising within the meaning of California Business & Professions Code § 17500.

  165. Defendants' untrue and misleading statements, described above, present a continuing threat to members of the public in that the acts alleged herein are continuous and ongoing, and the public will continue to suffer the harm alleged herein.

  166. As a result of Defendants' false and misleading statements it has been and will be unjustly enriched.  Specifically, Defendants have been unjustly enriched by millions of dollars in ill-gotten gains from the sale and prescription of Mirena®, sold in large part as a result of the false or misleading statements described herein.

  167. Pursuant to California Business & Professions Code § 17535, Plaintiffs seek an order of this Court compelling Defendants to provide restitution, and to disgorge the money it collected and profits it realized as a result of its unfair business practices, and injunctive relief calling for Bayer to cease such unfair business practices in the future.

## COUNT IX
### Deceit By Concealment

  168. Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

  169. From the time that Mirena® was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed, and up to the present, Defendants willfully deceived Plaintiffs by concealing from Plaintiffs, Plaintiffs' health care providers, the medical

community, and the general public, the true facts concerning Mirena®, which Defendants knew or had reason to know and had a duty to disclose.

170.    At all material times, Defendants conducted a sales and marketing campaign to promote the sale of Mirena®. In the course of that marketing campaign, Defendants willfully deceived Plaintiffs, Plaintiffs' physicians, the medical community, and the general public of the health risks and consequences of the use of Mirena® and concealed that Mirena® had a significant propensity to cause serious injuries to users including but not limited to, the injuries suffered by Plaintiffs as described herein.

171.    Bayer intentionally concealed and suppressed the true facts concerning Mirena® with the intent to defraud Plaintiffs, in that Defendants knew that Plaintiffs' physicians would not have prescribed it and Plaintiffs would not have purchased and used Mirena®, if Plaintiffs had known the true facts concerning the dangers from use of Mirena®.

172.    As a result of Defendants' fraudulent and deceitful conduct, Plaintiffs suffered injuries and damages as described herein.

## COUNT X
### Negligent And Intentional Misrepresentation

173.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

174.    From the time that Mirena® was first tested, studied, researched, manufactured, marketed and distributed, and up to the present, Defendants made false representations to Plaintiffs, Plaintiffs' health care providers, and the general public including, but not limited to misrepresentation that Mirena® was safe, fit, and effective for human use when used as directed.

175.    At all material times, Defendants conducted a sales and marketing campaign to promote the sale of Mirena® and willfully deceived Plaintiffs, Plaintiffs' health care providers, and the general public as to the health risks and consequences of using Mirena®.

176.    Defendants made the misrepresentations knowing them to be false or without any reasonable ground for believing them to be true. These misrepresentations were made directly

by Defendants and their authorized agents and sales representatives and in publications and other written materials directed to physicians, patients, and the general public, with the intention of inducing reliance and the prescription, purchase, and use of the Mirena®.

177.    Defendants' representations were false because Mirena® is not, and at all relevant times alleged herein, was not safe, fit, and effective for human use, and that using it is hazardous to health, and that Mirena® has a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by Plaintiffs as described above. Defendants' misrepresentations were made with the intention of inducing reliance and inducing the prescription, purchase, and use of the product.

178.    In reliance on Defendants' misrepresentations Plaintiffs were induced to purchase and use the Product. If Plaintiffs had known of the true facts Defendants concealed, Plaintiffs would not have used the Product. Plaintiffs' reliance upon Defendants' misrepresentations was justified because Defendants' misrepresentations were made through individuals and entities that were in a position to know the true facts.

179.    As a result of Defendants' negligent and intentional misrepresentations, Plaintiffs suffered injuries and damages as described above. Defendants' conduct demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to the Plaintiffs' rights, safety, and welfare such that, Plaintiffs, for the sake of example and by way of punishing Bayer, seeks punitive damages according to proof.

## COUNT XI
### Violation Of California Civil Code §§ 1750 et seq.

180.    Plaintiffs re-allege and incorporate all of the allegations of all of the preceding paragraphs.

181.    Plaintiffs are informed and believe that Defendants violated the Consumers Legal Remedies Act, California Civil Code §§ 1750 et seq. ("CLRA").

182.    Plaintiffs hereby seek injunctive relief against Defendants for their violations of California Civil Code §§ 1750 et seq. The CLRA applies to Defendants' actions and conduct

described herein because it extends to transactions which are intended to result, or which have resulted, in the sale of goods to consumers.

183.    This cause of action is brought pursuant to the CLRA.  This cause of action does not currently seek monetary damages and is limited solely to injunctive relief.  Plaintiffs intend to amend their Complaint to seek damages in accordance with the CLRA after providing Defendants with notice pursuant to Cal. Civ. Code § 1782.

184.    Plaintiffs are "consumers" within the meaning of California Civil Code § 1761(d).

185.    Defendants have violated, and continue to violate, the CLRA in representing that goods have characteristics and benefits which they do not have, in violation of California Civil Code § 1770(a)(5).

186.    At all relevant times, Defendants have committed acts of disseminating untrue and misleading statements as defined by California Civil Code § 1770, by engaging in the following acts and practices with intent to induce members of the public to purchase and use Mirena®:

        a.      Representing to Plaintiffs, Plaintiffs' physicians, and the general public that Mirena® was safe, fit and effective for human use, knowing that the representations were false, and concealing from the Plaintiffs, Plaintiffs' physicians, and the general public that the Product had a serious propensity to cause injuries to users;

        b.      Engaging in advertising programs designed to create the image, impression and belief by consumers and physicians that Mirena® was safe for human use, had fewer side effects and adverse reactions than other IUDs, constituted a convenient safe form of contraception even though Defendants knew these representations to be false and had no reasonable grounds to believe them to be true;

        c.      Purposely downplaying and understating the health hazards and risks associated with Mirena®.

187.    The foregoing practices constitute false and misleading advertising and representations within the meaning of California Civil Code § 1770.  Defendants' untrue and

misleading statements present a continuing threat to members of the public and individual consumers in that the acts alleged herein are continuous and ongoing, and the public and individual consumers will continue to suffer harm as alleged herein.

      188.    Unless Defendants are enjoined from continuing to engage in these violations of the CLRA, Plaintiffs and others will continue to be harmed by the wrongful actions and conduct of Defendants.  Pursuant to California Civil Code § 1780, Plaintiffs seeks an order of this Court for injunctive relief calling for Defendants to cease such deceptive business practices in the future.

      189.    Plaintiffs maintain and reserve the right to plead additional facts, theories of liability, causes of action, and/or to present evidence pertaining to Defendants' acts and omissions as may be subsequently identified through discovery and investigation in this matter. Plaintiffs reserve the right to present such evidence at the time of trial based upon such subsequently discovered acts, omissions or damages that are heretofore unknown or unidentified prior to the date of service of this Amended Complaint and maintain and reserve the right to thereafter move the Court to conform pleadings to proof in this matter.

      WHEREFORE, Plaintiffs Kalaki Clark, Tiffany Gregg, Sylvia Montes, Evelyn Ramirez and Toyana Robinson demand for judgment against Defendants as follows:

      A.    Compensatory damages according to proof;

      B.    Punitive damages;

      C.    Disgorgement of profits;

      D.    An award of attorneys' fees and costs;

      E.    Prejudgment interest and the costs of suit; and/or

      F.    Such other and further relief as this Court may deem just and proper.

Dated:  October  9 , 2013

Respectfully submitted,

Wendy R. Fleishman
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY  10013-1413
(212) 355-9500
wfleishman@lchb.com

Elizabeth A. Alexander
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
One Nashville Place
150 Fourth Avenue North, Suite 1650
Nashville, Tennessee  37219-2423
(615) 313-9000
ealexander@lchb.com

Heather A. Foster
Fabrice N. Vincent
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94804-3339
(415) 956-1000
hfoster@lchb.com
fvincent@lchb.com

*Attorneys for Plaintiffs*

1134811.1